(Nos. 17057, 17058, 17059, 17060.—Reversed and remanded.)
DAVID W. HALL *et al.* Appellants, *vs.* FRANK H. WOODS *et al.* Appellees.

*Opinion filed April 20, 1927.*

1. CONSTITUTIONAL LAW—*statute or by-law depriving a stockholder of right to vote for managers or directors of corporation is invalid.* Under section 3 of article 11 of the constitution all stockholders of a corporation must have the right to vote for the directors or managers of the company, and any provision of a statute or by-law having the effect of depriving a stockholder of such right to vote is contrary to the constitution.

2. MONOPOLIES—*grants or contracts tending to prevent competition are invalid.* Whatever tends to prevent fair competition, and thereby restrain trade, is opposed to public policy and unlawful, and grants or contracts whose tendency is to create a monopoly are void at common law.

3. CORPORATIONS—*section 7 of Corporation act does not prevent voting of stock for legitimate purpose.* The provision of section 7 of the general Corporation act that "no corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation, where the effect of such acquisition may be substantially to lessen competition," and the further provision that the section "shall not apply to corporations purchasing such stock solely for investment and not using the same, by voting or otherwise," to bring about the lessening of competition, are not intended to prevent the voting of stock for a legitimate purpose, and a corporation having acquired stock legitimately may vote it for a legitimate purpose.

4. SAME—*charter of corporation determines its character.* The character of a corporation and the purpose for which it was organized must be ascertained by reference to the terms of its charter.

5. SAME—*foreign agency and loan corporation cannot acquire stock of another company—waiver and estoppel.* Under section 9 of the general Corporation act, which provides that "no agency and loan corporation shall purchase or otherwise acquire, or loan money upon the stock of any other corporations, whether organized under the laws of this or of any other State," no foreign agency and loan corporation is authorized to so acquire stock of an Illinois company and vote the same in Illinois; nor can the title to such stock be acquired by waiver or estoppel, as such acquisition of stock is contrary to public policy as declared by statute and there is no estoppel against asserting the invalidity of the transaction.

6. SAME—*foreign corporation exercises powers only by comity.* A corporation created in one State cannot exercise its functions in another State as a legal right but only in accordance with the comity of nations, and the exercise of such powers in the latter State must be consistent with its laws and public policy, as the recognitionn of foreign laws is only a matter of favor, and a State has the right to prohibit a foreign corporation from exercising any part or all of its charter powers within its borders.

7. SAME—*stockholder's vote must be cast in person or by proxy.* Stock must be voted by the stockholder in person or by proxy, and where stock has been transferred to a corporation having no authority to hold it and the parties who transferred the stock to such corporation attempt to vote it as proxies for the corporation, such proxies, upon the objection of any competent stockholder, can not be counted.

8. SAME—*when equity will determine right to office in private corporation—injunction.* Where the right to an office in a private corporation is necessarily involved in a suit in equity the court will determine it, as well as any other issue in the case necessary to be decided in order to give complete relief, and stockholders are entitled to maintain a bill to restrain defendants from acting or attempting to act as directors or from interfering with persons properly acting as directors where the defendants were not properly elected.

9. SAME—*powers of directors of a corporation.* It is within the power and the duty of the board of directors of a corporation to control corporate affairs, to fix the duties of officers and employees, to adopt by-laws, and to manage the corporate property and business for the benefit of all the stockholders.

10. SAME—*when equity will not interfere with the management of a corporation.* Where the business of a corporation is being conducted successfully and profitably by its officers in harmony with the board of directors lawfully constituted, equity will not, at the request of some of the stockholders, interfere with the direction of the business by limiting or defining the extent or character of the duties imposed upon any officer, the amount of liabilities which may be incurred or the relations between the officers themselves or between them and the directors, when no controversy has arisen and there is no charge of fraud or gross mismanagement resulting or likely to result in loss.

11. SAME—*salary of director or officer must be authorized by by-law or board of directors.* A director of a corporation is not entitled, as against non-assenting stockholders, to receive a salary unless previously authorized by the by-laws of the corporation or by a resolution of the board of directors, and an officer who has

received a larger salary than authorized is held accountable for the excess at the suit of a stockholder against the corporation and the officer.

12. SAME—*equity will not appoint receiver for solvent concern.* Where a corporation is a going, solvent concern doing a profitable business, a court of equity will not interfere by appointing a receiver, in the absence of fraud.

13. SAME—*when a guardian ad litem fee is properly taxed against corporation in stockholders' suit.* In a suit among stockholders over the election of officers and directors, the defendants cannot complain that a guardian *ad litem* fee was taxed against the corporation and not against the complainants, where an incompetent party was brought in as a defendant to their cross-bill.

APPEAL from the Circuit Court of Cook county; the Hon. HUGO M. FRIEND, Judge, presiding.

ALICE GREENACRE, WEST & ECKHART, CHARLES S. DENEEN, and WILLIAM B. HALE, guardian *ad litem*, (WILLIAM L. BOURLAND, and WILLIAM ROTHMANN, of counsel,) for appellants.

H. K. TENNEY, W. T. ALDEN, C. R. LATHAM, and COOKE, SULLIVAN & RICKS, (GEORGE A. COOKE, of counsel,) for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

David W. Hall, May Cave Hall, Lucy A. Hall and Geraldine Hall Porter on March 20, 1925, filed a bill in the circuit court of Cook county against Frank H. Woods, John B. Russell and Joseph S. Duncan, praying for an injunction restraining them from acting or attempting to act as directors and president of the Addressograph Company, an Illinois corporation, from interference with the performance of the duties of secretary and treasurer of that company by D. W. Hall, and from instituting legal proceedings for the appointment of a receiver. The complainants base their right to relief on their election as directors of the

corporation at the annual meeting of the stockholders on March 12, 1925. The defendants answered the bill. On motion of Perley Morse, Adelaide V. Duncan and the Addressing Machines Securities Company they were permitted to become parties defendant to the bill and filed an answer adopting the answer which had been filed by the other defendants. All the defendants then filed a cross-bill against the complainants in the original bill, D. W. Hall as administrator of John B. Hall, deceased, Charles W. Hall, an incompetent person, Henry E. Hubbard and the Addressograph Company, praying for a decree declaring that Russell, Woods, David W. Hall and May Cave Hall were elected directors of the Addressograph Company at the stockholders' meeting of March 12, 1925, enjoining Hubbard (who the complainants in the original bill claimed had been elected president of the Addressograph Company) from acting as president and declaring his election illegal, enjoining the original complainants from acting as directors, construing the by-laws of the Addressograph Company, determining the powers and duties of the president and secretary and treasurer, ordering a dividend declared of $1,500,000, and appointing a receiver for the corporation. The cause was heard by the chancellor and a decree was rendered declaring David W. Hall, May Cave Hall, Frank H. Woods and John B. Russell the directors and Joseph S. Duncan the president of the Addressograph Company, that the acts of the orginal complainants as directors were void and ordering their bill dismissed for want of equity, enjoining Hubbard from acting as president and the complainants from interfering with the directors whom the court declared elected, construing the by-laws, fixing the salaries of the president and secretary and treasurer at $60,000 a year until they should be changed by the directors or a manager appointed by the court, directing the payment of a dividend of $500,000 and the retention of the rest of

the surplus as a reserve, and appointing Abel Davis "as the representative of the court, with the title of manager of the Addressograph Company, and with authority, in case of a dispute or deadlock between the directors, superior to the power and authority of any of the parties hereto to the extent and for the purposes indicated by this decree," and giving specific directions as to the powers and duties of the manager and the manner of their exercise. The complainants in the original bill, Henry E. Hubbard, and Charles W. Hall by his guardian *ad litem,* have appealed from this decree, and the appellees have assigned cross-errors.

The contest is between two groups of stockholders, each controlling one-half of the stock of the Addressograph Company, for the management and control of the corporation. The appeal is brought directly to this court, because by the assignments of error the appellants raise the question of the constitutional power of the Addressing Machines Securities Company to hold stock in the Addressograph Company. The litigation had its origin in a disagreement between the two groups of stockholders, not primarily about the conduct of the ordinary business of the Addressograph Company but concerning proposed changes of organization and corporate structure.

In 1893 Joseph S. Duncan had invented an addressing machine, which he named Addressograph, and began the manufacture of the machines, for which he obtained a patent. In 1895 John B. Hall acquired a half interest in the business, exclusive of accounts receivable, and on February 15, 1896, the Addressograph Company was incorporated with a capital stock of $25,000, divided into 500 shares of the par value of $50. Hall subscribed for 248 shares, Duncan for 238, Adelaide V. Duncan, his wife, for 10, W. C. Duncan, a relative, for 2, and H. B. Munger for 2. The subscriptions were paid by transferring to the corporation the business and the patent. No other capital has

been put in the business. John B. Hall, W. C. Duncan, H. B. Munger and Joseph S. Duncan became the first board of directors, and by-laws were adopted containing the following provisions, which remained unchanged until after the annual meeting of the stockholders on March 12, 1925:

*"Article I.*

"Section 1. The officers of this corporation shall consist of a president, secretary and treasurer, who shall be elected by the directors and shall perform the duties usually appertaining to their respective offices, and four directors. Said officers shall hold office for one year, and until their successors are elected and qualified.

"Sec. 2. No person shall be eligible to the office of president or treasurer who is not a director, and no person shall be eligible to the office of director who is not a stockholder. A president, treasurer or director who ceases at any time to be a stockholder shall at the same time cease to hold any office in this corporation.

"Sec. 3. The board of directors may by resolution require any and all general officers to give a bond to the corporation, with sufficient sureties, conditioned for the faithful performance of the duties of their respective offices and such other conditions as may from time to time be required by the board of directors.

"Sec. 4. All written contracts entered into in behalf of the corporation shall be signed by the secretary, or, in his absence, by the president.

*Article II.—Directors.*

"Section 1. The affairs of this corporation shall be managed by a board of four directors, elected by the stockholders at the regular annual meetings, who shall hold office for one year and until their successors are elected.

"Sec. 2. The directors shall elect all other officers and appoint all agents. Vacancies in the board of directors may

be filled by the remaining members of the board at any regular or special meeting of the board.

"Sec. 4. The regular meetings of the board of directors shall be held immediately after the adjournment of each regular annual meeting of stockholders, and also upon the third Thursday of each month, at three o'clock P. M. Such meetings shall be held at the general offices of the corporation.

### Article IV.—Stockholders' Meetings.

"Section 1. The regular annual meeting of the stockholders of this corporation shall be held at the general office of the corporation in the city of Chicago on the 12th day of March in each year at two P. M., provided that when said day shall fall on Sunday, or a legal holiday, such meeting shall be held on the following day at the same place and hour. Special meetings of stockholders may be called by the directors.

"Sec. 4. At any stockholders' meeting a majority of the stock must be represented to constitute a quorum for the transaction of business, but the stockholders present at any meeting, although less than a quorum, may adjourn the meeting to some other day or hour.

"Sec. 5. The president and secretary of the corporation shall act as president and secretary of each stockholders' meeting unless the meeting shall otherwise decide. Any stockholders' meeting at any time may elect a president and secretary of the meeting, and thereupon the president and secretary of the corporation shall no longer act as president and secretary of said meeting.

### Article V.—Duties of Officers.

"Section 1. The president shall have general supervision of the affairs of the company, superintend the manufacturing of machines, links, type cases, cabinets, ink and other things, and shall in their absence exercise the duties of the secretary and treasurer.

"Sec. 2. The treasurer shall collect all money and accounts due the company and shall deposit same in the bank to the credit of the company, and is authorized to issue checks in payment of accounts and endorse and deposit all checks received. Also assign, endorse or discount notes, drafts or other negotiable paper.

"Sec. 3. The secretary shall have general supervision of the accounts, sales, salesmen, agents, advertising, etc., and shall make and assign all contracts for machinery, material and supplies purchased and for machines, goods and merchandise sold, assign territory to agents and salesmen, and make such other contracts as the necessity of the business may require, and execute bonds and guarantees.

"Sec. 4. The assistant treasurer shall in his absence exercise the duties of the treasurer.

"Sec. 5. The assistant secretary shall in his absence exercise the duties of the secretary."

Duncan became president and Hall secretary and treasurer of the corporation. Duncan had charge particularly of the designing and manufacturing and Hall of the selling and the supervision of the business. From time to time Duncan obtained many patents for new inventions and improvements on the machine, which were all assigned to the company. The business prospered. The salaries of Duncan and Hall were at first $1500 a year but in 1909 were fixed at $60,000 a year each, where they remained except for the year 1911, when they were $50,000 each. David W. Hall, who was a son of John B. Hall, left college in 1905 and was employed by the corporation as a salesman. The following year he was elected a director in place of Munger. Mrs. Duncan had succeeded W. C. Duncan as director in 1898. From 1906 Mr. and Mrs. J. S. Duncan and J. B. and David W. Hall constituted the board of directors until the death of J. B. Hall, in January, 1921. May Cave Hall, David's wife, succeeded J. B. Hall as director. David W. Hall became assistant treasurer in 1912 at a sal-

ary of $14,000 a year. After the death of his father he became secretary and treasurer at a salary of $60,000 a year. No dividend was declared until 1919, when a dividend of $200,000 was paid. Dividends have since been paid at irregular intervals, the total amount of all dividends paid by the company being $1,100,000. Duncan is sixty-seven years old and has no children. He had established a charitable trust with the Northern Trust Company as trustee, to which were transferred 80 shares of his stock, which, however, he retained the right to dispose of and replace in the trust with the proceeds. Duncan had desired to sell his interest in the corporation for several years before J. B. Hall's death, and at the time of his death negotiations were pending between them for the purchase of Duncan's interest by Hall, including the stock held in trust, a part of the purchase price to be paid in annual installments extending over a period of seventeen years. There is a difference between Duncan and David W. Hall as to the amount of the proposed purchase price,—whether it was two or two and a half million dollars. After the death of J. B. Hall negotiations were continued for a time with his son, who succeeded him in the control of the Hall interests, but were without result. On February 15, 1924, Duncan entered into a written contract whereby he agreed to sell the Duncan interests (half of the stock of the corporation) to John B. Russell, of New York City, Perley Morse, of Suffern, New York, and Frank H. Woods, of Lincoln, Nebraska, for $2,500,-000, of which $250,000 was paid in cash. The remainder of the purchase price was payable by February 15, 1925, and if not paid by that time the $250,000 was to be forfeited and the contract ended. The purchasers organized the Addressograph Securities Corporation under the laws of the State of Delaware and sought to assign their contract to that corporation, but Duncan and Hall objected to its name. The name was thereupon changed to the Addressing Machines Securities Company, and on August 7,

1924, Duncan and the purchasers, together with the Addressing Machines Securities Company, executed a supplementary contract for the transfer of the stock to that company, and 245 shares of the stock were transferred by the purchasers to the Delaware corporation. The 80 shares which had been placed in trust were not transferred to the purchasers, however, until their transfer was compelled by a writ of *mandamus*. By a supplemental agreement dated September 27, 1924, the time for payment of the balance of the purchase price was extended for six months from February 15, 1925, and by the supplemental agreement of March 12, 1925, the time for payment was still further extended to June 15, 1926.

The annual meeting of the stockholders was held on March 31, 1924. The stock of the corporation was then held as follows: J. S. Duncan 3 shares, Perley Morse 2 shares, A. V. Duncan 1 share, J. B. Russell 82 shares, Frank H. Woods 82 shares, Northern Trust Company, trustee, 80 shares, L. A. Hall 70 shares, D. W. Hall 25 shares, M. C. Hall 25 shares, G. H. Porter 50 shares, estate of J. B. Hall 80 shares. At that meeting the following directors were elected: J. B. Russell, J. S. Duncan, D. W. Hall and M. C. Hall. Before the stockholders' meeting, Duncan, Morse, Woods and Russell endeavored to secure an agreement with the Hall interests, including the resignation of Duncan as president, the election of Woods and Russell as directors and of Russell as president, and the election of Duncan as chairman of the board, consulting engineer, or to some other position with the corporation, but no agreement was made and Duncan held over as president without re-election and Hall as secretary and treasurer.

The contract of purchase of the Duncan interests provided for the application to the purchase price of all dividends that might be declared and all distributions of invested capital by the Addressograph Company, and the purchasers of the Duncan interests contemplated the distri-

bution to the stockholders of a million dollars or more of the assets of the Addressograph Company, and the reduction thereby of the amount which they would be required to produce from other sources to complete the purchase. The statement of the financial condition of the Addressograph Company at the close of business December 31, 1923, showed $4,146,598.26 of surplus and undivided profits, of which the sum of $563,827.45 was in cash and the sum of $1,359,613.40 was in United States government bonds. At the directors' meeting held June 19, 1924, Hall moved that a dividend of $500,000 be declared, payable July 1, 1924, in Liberty bonds. The motion was seconded by Mrs. Hall, but on being put was lost by a tie vote, Russell and Duncan having voted in the negative. Hall then moved for a dividend of $450,000, but this motion was lost by the same tie vote. The reason of the opposition of the Duncan interests to a dividend at that time was that the 80 shares of the Duncan stock which had been put in the trust created by Duncan had not been transferred to the purchasers of the Duncan interests, and the Hall interests were resisting the transfer. In the directors' meeting of September 4, 1924, a dividend of $300,000 was declared. This dividend brought the total of dividends paid by the corporation during its life to $1,100,000. For the Duncan interests it was contended that the dividend should be $450,000 or $500,000. Hall took the position that the capacity of the plant and equipment had been passed, that more factory space was needed and a reasonable consideration for the future growth of the business suggested the construction of a new building, and that the surplus had been allowed to accumulate for that purpose. At a directors' meeting held on September 4, 1924, Hall was authorized to rent two floors in the Kipper building, in which the Addressograph Company was already occupying four floors. The building owned by the Addressograph Company occupies about half a block and is six stories high. The floor space

used by the company in the two buildings is about 4.2 acres. The Kipper building is connected by runways about 36 feet long with the building of the Addressograph Company used for its main factory. The two floors of the Kipper building were leased for a term of three years. It is questionable whether the additional space so leased more than takes care of the present necessities of the Addressograph Company or provides any margin for probable future requirements.

The purchasers of the Duncan interests desired a reorganization of the Addressograph Company, increasing its capital stock to a size commensurate, as they believed, with the actual resources of the corporation. Their plans included taking $2,000,000 or more of the assets from it, increasing the capital stock and issuing the obligations of the corporation to such an amount as they deemed advisable. Hall thought that the purpose was to so manipulate the corporation and its finances that the larger part of its assets should be represented by its indebtedness, leaving the stockholders with little, if anything, actually invested. The two factions were dealing at arms' length, each having attorneys present at the various directors' meetings held in 1924 and acting on their advice. The purchasers wanted Duncan to resign as director and president, two of their number to be elected directors and Russell president. Hall would not agree to this and therefore Duncan did not resign. The purchasers wanted an additional dividend but the Hall directors refused. Hall wanted to prepare for greater production and increased sales,—at least to the extent of considering the advisability of building a new factory,—but the Duncan interests declined. Russell advocated the creation of a patent department, through which the records pertaining to the numerous and valuable patents of the corporation would be classified and protected, and the adoption of a modern accounting system, by means of which the financial condition of the corporation might be ascertained at any time. Under the old systems the rec-

ords pertaining to patents were in a state of confusion, and the actual financial condition of the corporation could only be determined at the time of taking the inventory at the close of each fiscal year. Russell occupied a desk in the office of the president and conducted a personal investigation of the different departments, asking specific data from the heads of departments to familiarize himself with the business of the corporation. Hall objected to this and requested that Russell get from him such information as he wanted and cease distracting the attention of employees from the work he had given them to do. Hall contended that he was authorized to perform the duties which the by-laws imposed upon him as secretary and treasurer without supervision by or consultation with the president or board of directors. Acting on this view he proceeded to engage important employees, to rent property in Boston, to spend more than $275,000 in advertising, and to do other things without consultation with either the president or board of directors. The Hall interests conceived the idea that the plan of the purchasers of the Duncan stock constituted high finance, which might result in wrecking the corporation. The Duncan interests conceived the idea that the Hall interests were seeking to force them to buy the Hall interests at an exorbitant price or sell the Duncan interests at a low price. The controversy of the officers of the corporation had a tendency to disorganize the employees. At the directors' meeting of November 3, 1924, Russell moved that Hall's salary as secretary and treasurer for 1924 be fixed at $30,000, and if he had received anything in excess of that amount such excess should be returned to the company and the president should be authorized to take action to recover it. The president ruled that Hall was incompetent to vote on the resolution, and it was carried by the votes of Russell and Duncan for it, Mrs. Hall voting against it. Thereupon Hall moved that the president's salary for 1924 be fixed at $12,000, and if he had received more than that

amount the excess should be returned to the company and the secretary should be authorized to take action to recover it. This motion also was carried, Hall and his wife voting for and Russell against it, Duncan being incompetent to vote. At a meeting on November 12, 1924, Russell moved that the action of November 3 fixing Hall's salary be set aside and his salary fixed at $12,000, that he return any excess over $12,000 which he had received, and that the president be authorized to take action to recover the excess. The motion was carried by the votes of Russell and Duncan against Mrs. Hall.

In spite of the want of agreement among the directors the business of the corporation increased during the year 1924 and the net profits for the year amounted to $779,-627.05. Notice of the annual stockholders' meeting on March 12, 1925, was given by Hall, as secretary, on March 2 to the stockholders of record on that date, viz.: Addressing Machines Securities Company 245 shares, Adelaide V. Duncan, Perley Morse, J. S. Duncan, J. B. Russell and F. H. Woods 1 share each, D. W. Hall 25 shares, M. C. Hall 25 shares, Lucy A. Hall 70 shares, Geraldine Hall Porter 50 shares, administrator of the estate of J. B. Hall 80 shares. All the stockholders were present at the meeting or were represented by proxy. The proxy of the Addressing Machines Securities Company was held by Frank H. Woods and J. B. Russell. The proxies were presented and recognized, and the business of the meeting, except the election of directors, was disposed of without any question of the right of the Addressing Machines Securities Company to take part in the meeting through its proxies. A motion that the secretary cast the unanimous ballot of all the stockholders for David W. Hall, May Cave Hall, John B. Russell and Frank H. Woods for directors was lost and the election of directors proceeded by ballot. The ballots were distributed, written and filed with the secretary, and thereupon objection was made on behalf of the

Hall interests to counting the votes of the Addressing Machines Securities Company "because stock issued and standing in name of Addressing Machines Securities Company cannot be legally held or legally voted by it for following, among other, reasons: First, proxy is in joint name of J. B. Russell and Frank H. Woods; second, Illinois statute purporting to authorize corporations to vote stock of other corporations is unconstitutional and void; third, because the effect of holding and voting said stock by said Securities Company has a tendency to lessen competition and tends to create a monopoly, contrary to the laws of Illinois and of the United States; fourth, because Securities Company is an agency and loan corporation under the laws of Illinois." The president ruled against the objection. The secretary tallied the vote and reported: For M. C. Hall 479, D. W. Hall 479, G. H. Porter 21, L. A. Hall 21, F. H. Woods 10, J. B. Russell 10; that he had not counted the ballots cast on behalf of the Addressing Machines Securities Company, which purported to give 490 votes each to Woods and Russell, and the secretary declared M. C. Hall, D. W. Hall, G. H. Porter and L. A. Hall elected directors of the company. The president ruled that J. B. Russell, Frank H. Woods, D. W. Hall and May Cave Hall were elected. Immediately after the adjournment of the stockholders' meeting a directors' meeting convened with only D. W. Hall and May Cave Hall present, and the meeting was adjourned to five o'clock in the afternoon of the same day, at room 822 First National Bank building. At that time and place Lucy A. Hall was also present, and the meeting elected L. A. Hall president and D. W. Hall secretary and treasurer for the ensuing year. At a meeting held on March 14 section 2 of article 1 of the by-laws was amended by striking out the provision requiring officers to be also directors. Lucy A. Hall then resigned as president and Henry E. Hubbard was elected in her stead. Hubbard had for twenty-five years been an efficient employee of the

company in charge of the experimental department under Duncan. Russell and Woods held meetings but no business was attempted. Thereupon the bill was filed on March 20, 1925, by the Hall directors and a temporary writ of injunction was issued.

At the foundation of the whole case is the question of the right of the Addressing Machines Securities Company to hold the stock of the Addressograph Company standing in its name, for if it has such right the appellants' claim that Lucy A. Hall and Geraldine Hall Porter are members of the board of directors of the Addressograph Company and that Henry E. Hubbard is its president has no basis to rest on. The first objection to such holding of stock raises a constitutional question and is based on section 3 of article 11 of the constitution, which provides that "the General Assembly shall provide, by law, that in all elections for directors or managers of incorporated companies, every stockholder shall have the right to vote, in person or by proxy, for the number of shares of stock owned by him, for as many persons as there are directors or managers to be elected, or to cumulate said shares, * * * and such directors or managers shall not be elected in any other manner." In *People* v. *Emmerson,* 302 Ill. 300, it was held that this section was intended to provide that all stockholders under this provision of the constitution must have the right to vote for the directors or managers of the company, and any provision having the effect of depriving any stockholder of the right to vote for managers or directors is contrary to the constitution.

Section 2 of the general Corporation act authorizes the organization of corporations for any lawful purposes except certain purposes specified in that section. Section 6 provides that "each corporation organized under this act shall, subject to the conditions and limitations prescribed by this act, have the following powers, rights and privileges: * * * (6) To own, purchase or otherwise ac-

325—9

quire, whether in exchange for the issuance of its own stock, bonds, or other obligations or otherwise, and to hold, vote, pledge, or dispose of the stocks, bonds, and other evidences of indebtedness of any corporation, domestic or foreign." Previous to this act a corporation could not become a stockholder in another corporation unless the power was specifically granted in its charter or necessarily implied. (*People* v. *Chicago Gas Trust Co.* 130 Ill. 268; *People* v. *Pullman Car Co.* 175 id. 125; *McCoy* v. *World's Columbian Exposition,* 186 id. 356; *Dunbar* v. *American Telephone and Telegraph Co.* 238 id. 456; *Converse* v. *Emerson, Talcott & Co.* 242 id. 619; *People* v. *Union Gas Co.* 254 id. 395.) Section 6 specifically grants this right to every corporation under the act, subject to conditions and limitations prescribed by the act. Among these limitations it is prescribed by section 7 that "no corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation, where the effect of such acquisition may be substantially to lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain trade in this State or in any section or community thereof, or tend to create a monopoly." This limitation is, however, itself qualified by the further provision of the same section 7 that it "shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition."

Counsel for the appellants maintain that the meaning of this sentence of section 7 is that the limitation on the right to acquire stock where such acquisition may have the effect to lessen competition or restrain trade or tend to create a monopoly "shall not apply to corporations purchasing such stock solely for investment and not using such stock by voting or not using it in any other manner to bring about, or in attempting to bring about, the substantial lessening

of competition." It is contended that the condition against voting the stock is absolute, without regard to the object or purpose of the voting, but the condition against using the stock otherwise applies only where the object or purpose of such use otherwise is to bring about the substantial lessening of competition. The object of section 7 is to prevent the exercise of the privilege of acquiring stock in corporations by other corporations for the purpose of lessening competition, restraining trade in this State or creating a monopoly, and the object of that part of the section just quoted is to allow such privilege to corporations purchasing stock for investment and not using it to bring about, or in attempting to bring about, the substantial lessening of competition, either by voting or otherwise. It is the use to bring about the lessening of competition against which the limitation is directed, and it applies to every means used for that purpose, whether by voting or otherwise, but not to the mere voting of the stock for a legitimate purpose.

Counsel argue that under this construction the right to vote the stock of the corporation is restricted, because the constitution gives the absolute, unqualified, unconditional right to vote the stock, which cannot be taken away, limited or interfered with by the legislature. Whatever tends to prevent competition, and thereby restrain trade and create a monopoly, is opposed to public policy and unlawful. Grants and contracts whose tendency is to create a monopoly are void at common law. (*People* v. *Chicago Gas Trust Co. supra; Dunbar* v. *American Telephone and Telegraph Co.* 224 Ill. 9.) The purchase of stock by a corporation solely as an investment is allowed by section 7 and no restriction is placed upon its lawful use by the purchaser. The use of such corporate stock to create a monopoly, whether held by a corporation or an individual, is unlawful. The corporation having acquired the stock may vote it the same as the individual holder and with the same result that if voted

in such a manner as to lessen competition the law will not permit the unlawful result to be accomplished.

The appellants contend that the Addressing Machines Securities Company is prohibited from acquiring stock in the Addressograph Company by section 9 of the general Corporation act, which provides that "no agency and loan corporation shall purchase or otherwise acquire, or loan money upon the stock of any other corporations, whether organized under the laws of this or of any other State." Section 3 provides that agency and loan corporations may be organized "for the purpose of acting as agents and brokers for others in the purchase, sale, renting and management of real estate and leasehold interests, in the operation of an insurance agency business, in the negotiation of loans on real estate and leasehold interests, and for the purpose of lending money on bonds or notes secured by mortgages or trust deeds on real estate or leaseholds or on the mortgage bonds of industrial or railroad companies or of any public service corporation or on any State, municipal, or *quasi* municipal bonds, or for the purpose of buying, selling, pledging, mortgaging or otherwise dealing in any of such securities; and for the purpose of acting as trustee in connection with any of the foregoing securities, and for no other purpose." It is insisted that the Addressing Machines Securities Company belongs to this class of corporations.

The character of a corporation and the purpose for which it was organized must be ascertained by reference to the terms of its charter. (*Reed* v. *People,* 125 Ill. 592; *Distilling Co.* v. *People,* 161 id. 101; *Evanston Illuminating Co.* v. *Kochersperger,* 175 id. 26.) The charter of the Addressing Machines Securities Company authorizes it, among other things, to carry on a general agency, brokerage and commission business; to purchase, sell, pledge, invest in and deal in and with, either as principal or as factor or broker, for commission, bonds, stocks, mort-

gages, securities and obligations of every kind and nature; to undertake and carry out the administration of any corporation, undertaking, business or affairs; to issue and underwrite issues of bonds, securities and obligations; to act as underwriter, generally, for all manner and class of securities and investments; to lend and advance money and give credit on such terms and conditions and to such persons as the board of directors may deem conducive to the best interests of the corporation; to purchase or otherwise acquire, own, mortgage, pledge, sell, assign and transfer, invest, trade, deal in and deal with, real and personal property of every class and description; to promote, invest in securities of, to aid with capital, credit, means or resources, to act as fiscal agent for, to organize, re-organize, adjust, merge, consolidate or otherwise assist and afford facilities to any corporation, company, body politic or association of persons organized or to be organized under the laws of Delaware or elsewhere; to act as agent or trustee or in any other capacity for and in behalf of such corporation. Thus every power which belongs to agency and loan corporations under the general Corporation act finds its counterpart in the charter of the Addressing Machines Securities Company. The charter confers the powers not only of an agency and loan corporation, but of a holding company, a manufacturing company, a mercantile company, a contracting company, and many other powers. The corporation has not filed in the office of the Secretary of State any statement of its desire to carry on in this State business of any character and has received no certificate of authority to transact any business in this State. The general Corporation act forbids agency and loan corporations to purchase or otherwise acquire stock in any other corporation. Therefore a foreign corporation having the same powers as an agency and loan corporation has no authority in this State to purchase or otherwise acquire stock in another corporation. A corporation created in one State cannot ex-

ercise its functions in another State as a legal right but only in accordance with the comity of nations, by which the laws of one country, and contracts made, rights acquired and obligations incurred in accordance with them, are recognized and enforced in another country unless repugnant to the laws or public policy of the latter. (*Harding* v. *American Glucose Co.* 182 Ill. 551; *Hazelton Boiler Co.* v. *Tripod Boiler Co.* 142 id. 494; *Carroll* v. *City of East St. Louis,* 67 id. 568; *Ducat* v. *City of Chicago,* 48 id. 172; *Bank of Augusta* v. *Earle,* 13 Pet. 519.) The comity thus extended in the recognition of foreign laws is a matter of favor and cannot be claimed as a right. It is voluntary with the State and not obligatory, though in the absence of a positive rule affirming, denying or restraining the operation of foreign laws, courts of justice presume the tacit adoption of them by their own government, unless they are repugnant to its policy or prejudicial to its interest. A State, however, has the right to prohibit a foreign corporation from exercising any part or all of its charter powers within its borders. (*Alpena Cement Co.* v. *Jenkins & Reynolds Co.* 244 Ill. 354.) The Addressing Machines Securities Company is excluded from the acquisition of the stock of the Addressograph Company because it is an agency and loan corporation, and is for that reason subject to the disability imposed by section 9 of the general Corporation act. It is against the public policy of this State that corporate stock shall be acquired or held in pledge by corporations having the powers of agency and loan corporations.

It is contended that the Hall interests did not come into equity with clean hands and are precluded by their own conduct from obtaining equitable relief. The Duncan and Hall parties were dealing at arms' length throughout. The Hall party regarded the Addressing Machines Securities Company as the purchaser of the Duncan stock, and, after the transfer to it, as the holder, until Hall received

contrary advice from his attorney the evening before the stockholders' meeting of March 12, 1925, though his attorney had had the question under consideration before that time. Whether or not the Addressing Machines Securities Company could acquire the stock of the Addressograph Company was a question of law,—not of fact. It had not that power and no agreement among the stockholders could give it the power. Neither could the title of the stock be acquired by waiver or estoppel. The acquisition of the stock was illegal because against public policy, as declared by the statute, and therefore cannot be ratified; nor is there any estoppel against asserting its invalidity. (Elliott on Contracts, sec. 6779; *Coppell* v. *Hall,* 7 Wall. 542; *Lyon* v. *Waldo,* 36 Mich. 345; *Durkee* v. *People,* 155 Ill. 354; *Lyons* v. *Schanbacher,* 316 id. 569.) The enforcement of the provisions of the statute in such cases, whether as a basis of relief or ground of defense, is, as was said in *Coppell* v. *Hall, supra,* not for the sake of the party but of the law itself. The principle is essential to the purity of the administration of the law, which will not enforce what it has forbidden and denounced. "In cases where the agreements or other transactions are repudiated on account of their being against public policy, the circumstance that the relief is asked by a party who is *particeps criminis* is not in equity material. The reason is, that the public interest requires that relief should be given, and it is given to the public through the party." (1 Story's Eq. Jur.—12th ed.— sec. 298.)

Since the Addressing Machines Securities Company was prohibited by law from acquiring the stock of the Addressograph Company it could not vote such stock, but the appellees argue that the attempted vote of the Addressing Machines Securities Company should have been counted because Duncan, Russell, Woods and Morse were the equitable owners of the stock, were present or represented at the meeting, and wished the stock voted as the Addressing

Machines Securities Company attempted to vote it. Stock must be voted by the stockholder in person or by proxy. The transfer to the Addressing Machines Securities Company was void. It did not cast a vote as proxy. The stockholders who attempted to transfer the stock to the Addressing Machines Securities Company did not part with the title by their void attempt to transfer it but did not seek to vote the stock which they had attempted to transfer. The election was to be determined by the votes of the stockholders cast in person or by proxy, and each stockholder had the right to object to any vote being counted which was not cast by a stockholder in person or by proxy. Where the right to an office in a private corporation is necessarily involved in a suit in equity the court will determine it, as well as any other issue in the case necessary to be decided in order to give complete relief. (*Chicago Macaroni Co. v. Boggiano,* 202 Ill. 312.) It was not necessary to appeal from the decision of the president that Russell and Woods were elected. The title of the directors elected did not depend upon the decision of the presiding officer or of the stockholders expressed in any other way than by their ballots. When that title is brought in question it must be determined according to the lawful ballots cast. The result of the election therefore was that D. W. Hall, May Cave Hall, Lucy A. Hall and Geraldine Hall Porter were elected directors. They were therefore entitled to maintain the bill to restrain the defendants to it from acting or attempting to act as directors or from interfering with the persons elected acting as directors.

So far as the cross-bill prayed for relief in favor of the Addressing Machines Securities Company as the holder of stock in the Addressograph Company it could not be maintained.

The cross-bill prayed for the specific relief of a decree that John B. Russell, Frank H. Woods, David W. Hall and May Cave Hall were duly elected directors of the Ad-

dressograph Company at the meeting of the stockholders on March 12, 1925; restraining David W. Hall, May Cave Hall, Lucy A. Hall and Geraldine Hall Porter from taking action of any kind as directors of the Addressograph Company, and declaring all action taken by them, or a majority of them, while assuming to act as directors of said corporation, illegal and void; restraining Henry E. Hubbard from acting or assuming to act as president of the Addressograph Company and declaring that the attempt to elect him president was illegal and void. It follows from our decision that David W. Hall, May Cave Hall, Lucy A. Hall and Geraldine Hall Porter were elected directors at the meeting on March 12, 1925, that no part of this relief can be granted. The business of the Addressograph Company is now being conducted by the legally constituted board of directors elected on March 12, 1925, and the president Henry E. Hubbard elected by them.

The cross-bill also prays that David W. Hall be restrained, as secretary and treasurer, from expending any moneys of the corporation in excess of $500, or any sum of money for advertising, or making any contracts that will obligate the corporation to expend any money in excess of $500, or from taking any action in reference to the general business policies of the corporation without first obtaining the approval of the board of directors; that the by-laws be construed to mean that the powers of the secretary and treasurer should be those of an administrative agent acting under instructions and directions of the president and legally constituted board of directors, and that the court construe the by-laws of the corporation and determine the rights, powers and duties of the president and the rights, powers and duties of the secretary and treasurer, respectively. It is within the power and the duty of the board of directors to control the affairs of the corporation, to fix the duties of its officers and employees, to adopt by-laws, and to manage the corporate property and business for the

benefit of all the stockholders. While the business of the corporation is being conducted successfully and profitably by its officers in harmony with the board of directors lawfully constituted, a court of chancery will not interfere, at the request of some of the stockholders, with the direction of that business by limiting or defining the extent or character of the duties imposed upon any officer or officers, the amount of liabilities which may be incurred or the relations between the respective officers or between the officers and the board of directors, when no controversy has arisen or matter of dispute exists among them and when there is no charge of fraud or gross mismanagement resulting or likely to result in loss to the corporation or to any of the stockholders.

The cross-bill also prayed that the court fix the compensation which the president and secretary and treasurer are entitled to receive from the Addressograph Company for the year 1924; that in the event either the president or the secretary and treasurer has withdrawn any sum in excess of the amount so fixed the court render a decree for such excess and award the Addressograph Company an execution therefor. Duncan as president and D. W. Hall as secretary and treasurer received during 1923 a salary, the amount of which was fixed at the first meeting of the directors in 1923 at $60,000 each. No officers were elected by the directors in 1924, and Duncan held over as president and Hall as secretary and treasurer, respectively, during that year. No action was taken by the directors in regard to the salaries for 1924 but each proceeded to draw a salary at the rate of $60,000. At a directors' meeting on June 16, 1924, a motion was made that no further salaries be paid until their amount had been fixed by the board of directors, but it was lost, Duncan and Russell voting in the affirmative and Hall and his wife in the negative. Hall continued to draw a salary at the old rate of $60,000 a year. At a directors' meeting on November 3, 1924, after various

motions made and lost because of a tie vote or because Hall or Duncan was disqualified from voting, the salary of the secretary and treasurer was fixed at $30,000 a year and the officer directed to return to the corporation anything drawn in excess of that amount. Thereupon Hall moved that the salary of the president for 1924 be fixed at $12,000 and that Duncan return anything drawn by him on account of salary in excess of that amount, and the motion was carried by the affirmative votes of Hall and his wife, Russell voting in the negative and Duncan being disqualified. On November 12 the action of November 3 fixing Hall's salary as secretary and treasurer at $30,000 was rescinded and his salary fixed at $12,000, and he was ordered to return any sum in excess of $12,000 which he had received during 1924 as salary. . The motion to this effect was carried by the votes of Duncan and Russell in the affirmative against Mrs. Hall in the negative, Hall being disqualified to vote on account of his interest. Hall has never returned the excess which he had received above his salary of $12,000 fixed by the board of directors but has retained $60,000 as his salary for 1924. A director of a corporation is not entitled, as against non-assenting stockholders, to receive a salary unless previously authorized by the by-laws of the corporation or by a resolution of the board of directors, and an officer who has received a larger salary than authorized is held accountable for the excess at the suit of a stockholder against the corporation and the officer. (*Brown* v. *DeYoung,* 167 Ill. 549.) The decree found the president and secretary were each entitled to a salary of $60,000 for the year 1924, and its decree as to the excess above $12,000 is erroneous.

No ground is shown for the appointment of a receiver or manager. The deadlock on which the cross-complainants base their claim for this kind of relief does not exist. Whatever may have been the situation before the meeting of March 12, 1925, there is now no deadlock in the board

of directors. The corporation is a going, solvent concern doing a profitable business, with which a court of equity will not interfere by appointing a receiver, in the absence of fraud.

The only other prayer for specific relief in the cross-bill is the prayer for a declaration of a dividend of $1,500,000 out of the surplus of the corporation. The court ordered a dividend of $500,000, to which the appellants have not objected, but the appellees have assigned cross-error that the court failed to order a dividend of the amount asked for. The surplus of the corporation is about $4,600,000, a large part of it accumulated before the death of John B. Hall. About $1,900,000 of the assets of the association consists of Liberty bonds and cash deposited in inactive bank accounts, while there is no fixed debt and the current liabilities are about $500,000. There is a difference of opinion among the stockholders as to the reason or desirability of maintaining so large a cash surplus, the Hall interests believing that the manufacture of new machines in process of development and the prospective future growth of the business would demand more room and the construction of a new building and that it is wise business management to keep a large surplus in reserve for such use, and the Duncan interests believing that good business judgment and wise economy require the distribution of a large part of the surplus and the meeting of the expense of the development of new machines and the construction of new buildings, if and when required, by borrowing in some form, and that the expense thus incurred will soon be repaid out of the profits of the increased business. These are questions of business judgment to be determined by the directors of the corporation in their discretion, which will not be controlled by the court so long as it is exercised in good faith and in honesty of purpose. Each side impugns the good faith of the other. There is a decided difference of opinion, and each party charges that the other is actu-

ated by merely selfish motives and the desire to exclude those with whom they do not agree from any participation in the management of the affairs of the corporation. Each party has sought to avail itself of such advantages as the law gave it, but the record does not show fraud, oppression or dishonest conduct. The deadlock in the board of directors which is alleged in the cross-bill as the basis of relief does not exist and did not exist when the decree was rendered or the cross-bill filed. Another deadlock may arise, but the court cannot anticipate and will not interfere with the business of a prosperous going concern on the possibility, or even the probability, of future dissension in the management.

By the decree the guardian *ad litem's* fee was taxed against the Addressograph Company. The appellees contend that it should have been taxed against the complainants in the original bill. The appellants have assigned no error in regard to it. Charles W. Hall, the incompetent party, was made a defendant to the cross-bill by the cross-complainants in connection with their claim for relief in regard to the questions raised by the cross-bill. Costs in chancery are largely in the discretion of the chancellor. Taxing the guardian *ad litem's* fee against the Addressograph Company amounted practically to a division of it between the parties and was a proper disposition of the question.

The decree is reversed and the cause remanded, with directions to hear evidence as to the amount received by Joseph S. Duncan and David W. Hall for salaries as president and secretary and treasurer, respectively, for the year 1924, to enter a decree enjoining the defendants Frank H. Woods, John B. Russell and Joseph S. Duncan from acting or attempting to act as directors and president of the Addressograph Company and from interfering with the performance of the duties of secretary and treasurer of that company by David W. Hall, directing the payment of a dividend of $500,000, and requiring Duncan and Hall to pay

to the Addressograph Company the amounts, if any, found to have been received by them, respectively, in excess of $12,000, as salaries as president and secretary and treasurer for the year 1924. The costs of this court will be taxed equally against the appellants and the appellees.

*Reversed and remanded, with directions.*

Subsequently, after further consideration of the case, the following additional opinion was filed.

Per CURIAM: After the adoption of the foregoing opinion a rehearing was allowed on the petition of the appellees, additional arguments were filed, and the cause has been further considered by the court in the light of the newly presented arguments.

In the petition it is contended that the fundamental proposition of the opinion that the Addressing Machines Securities Company is an agency and loan corporation, and for that reason is prohibited by section 9 of the general Corporation act from purchasing the stock of the Addressograph Company, is based on a misconception of the policy of the State in regard to agency and loan corporations; that the policies of this State have nothing to do with the mere terms of a corporate charter, which is governed by the public policy of the State creating it, and that it is only when a foreign corporation begins to function in this State that the policy of this State becomes applicable. There is essentially no difference between foreign and domestic corporations under the statutes of this State. Their rights and privileges, liabilities and duties, are the same. All are alike subject, in the exercise of their charter powers, to the law of this State. A foreign corporation having the powers which an agency and loan corporation may exercise in this State is subject to the same restrictions as a domestic agency and loan corporation and cannot acquire the stock of any other corporation, whether organized under the laws of this or any other State. Although the Addressing Machines

Securities Company has not obtained a license to transact business in this State, all the business which it has done has been transacted in this State except the organization of the corporation in Delaware and the establishment there of a "technical office," as it was designated in the testimony, and the establishment of a technical office in New York. The object and purpose of the corporation was, among other things, to acquire, purchase and hold stocks of every kind and nature and of any corporation of any State, territory or country, and in pursuance of that purpose it entered into a contract in the city of Chicago to purchase the stock of the Addressograph Company, all its directors' meetings have been held in that city, and it authorized there the execution of a proxy to vote its shares of stock in the Addressograph Company at the stockholders' meeting in Chicago. It has no other assets than its shares of stock in the Addressograph Company, and the only inference to be drawn from the evidence is, that the chief purpose of its organization within two months of the purchase of Duncan's stock by Woods, Russell and Morse was the purchase and holding of this stock. The words "doing business" or "transacting business," as used in statutes regulating foreign corporations, refer to the transaction of the ordinary business in which the corporation is engaged and not to acts not constituting any part of its ordinary business, such as instituting and prosecuting actions in courts. (*Alpena Portland Cement Co.* v. *Jenkins & Reynolds Co.* 244 Ill. 354.) In this view of the meaning of these terms the corporation had, in the language of the petition for rehearing, begun to function in this State. It was carrying on within this State the very business which it was created to carry on, and it is not giving the public policy of this State an extra-territorial effect to apply to a foreign corporation thus entering the State the same rules which apply to domestic corporations. This corporation has the powers of an agency and loan corporation organized under the laws

of this State and must be subject to the same limitations. It might have applied to the Secretary of State for a license to do business in this State, filing a statement setting forth the character of business intended to carry on in this State and omitting the business of an agency and loan corporation, (General Corporation act, secs. 81, 82,) and it then could have exercised only the powers stated; but it did not do so. It is an agency and loan corporation and is subject to the disabilities of such a corporation, and the fact that it has no license to do business in this State does not relieve it of the disabilities.

Section 44 of the general Corporation act requires a list of stockholders to be made and filed at the principal office of the corporation ten days before each election and the stock ledger or transfer book shall be the only evidence as to who are stockholders entitled to vote at any meeting of stockholders. It is contended that since the name of the Addressing Machines Securities Company appeared on this list it was conclusively entitled to vote at the election. Every stockholder of a corporation has the right to vote his stock at every election of directors, and the legislature has no power to enact a law which will prevent his doing so. It may, however, declare a rule of evidence which will show a *prima facie* right but not one which will conclusively establish it. Stockholders may appeal to the courts to protect their right to participate in the corporate management and prevent the usurpation of control by persons not stockholders. Section 44 provides a rule for determining in advance who are stockholders entitled to vote, but the list made under that rule cannot deprive a stockholder of his right to vote or give the right to one who is not a stockholder. On a bill filed to determine the result of a past election the question of the rights of stockholders is the same as on a bill filed before the election, and in either case the statutory rule may determine the *prima facie* right, but it cannot, under the constitution, be conclusive.

The objection is made that if the Securities Company had no right to vote there was no quorum and no valid meeting. · This is on the theory that the Securities Company is the beneficial owner, which is not true. Russell, Morse and Woods are the beneficial owners and each had one share in his name, which, with the Hall 250 shares, was more than a majority.

It is contended that the Addressograph Company is not a corporation because the certificate of organization was not filed for record in the recorder's office of Cook county, and therefore the appellants have no cause of action. It was held in *People* v. *Mackey,* 255 Ill. 144, that a failure to file the final certificate of incorporation within two years from its date was fatal to the legal existence of the corporation and justified a judgment of ouster. It has, however, been held in several cases that the organization of a corporation which had failed to file its final certificate of organization within two years after its date was not subject to collateral attack in a suit between the corporation and an individual litigant. ·(*Bushnell* v. *Consolidated Ice Machine Co.* 138 Ill. 67; *Marshall* v. *Keach,* 227 id. 35; *Inter-Ocean Newspaper Co.* v. *Robertson,* 296 id. 92.) In *Africani Loan Ass'n* v. *Carroll,* 267 Ill. 380, the rule in *People* v. *Mackey, supra,* was referred to and the statement made that unless a homestead and loan association files for record with the recorder of deeds of the proper county its certificate of organization within two years it ceases to be a corporation and has no right to exercise any of the powers conferred by its charter. This was a misapplication of a rule which concerns only suits involving the *de jure* existence of a corporation, it was not essential in the decision of that case, which was decided on general equitable principles, and it has not been followed.

The opinion filed at the October, 1926, term will be again adopted and filed as the opinion of the court.