STATE SECURITY INSURANCE COMPANY, Plaintiff-Appellant and Cross-Appellee, v. FRANK B. HALL AND COMPANY *et al.*, Defendants-Appellees and Cross-Appellants.

First District (2nd Division)   Nos. 1—92—3236, 1—92—3433 cons.

Opinion filed February 8, 1994.

Leonard M. Ring & Associates, P.C., of Chicago (Leonard M. Ring and Leslie J. Rosen, of counsel), for appellant.

Winston & Strawn, of Chicago (Terry M. Grimm and W. Gordon Dobie, of counsel), for appellees.

JUSTICE SCARIANO delivered the opinion of the court:

Plaintiff State Security Insurance Co. brought suit against insurance broker Frank B. Hall & Co. and its subsidiary Frank B. Hall & Co. of Texas alleging that they had committed fraud when they failed to disclose overcharges made to insureds on policies written by plaintiff, and that defendants should have remitted those monies to it as part of the premiums paid by policyholders to defendants. Plaintiff appeals from a jury verdict awarding it only $100 in compensatory damages and from the denial of its post-trial motion; defendants cross-appeal from the judgment entered against them and from the denial of their post-trial motion.

In 1974, Steven Brody, then executive vice-president of plaintiff, began negotiations with Mendel Kaliff, a Texas insurance broker and sole owner of Morris H. Kaliff & Son (Kaliff Agency), seeking to expand its business of insuring amusement enterprises. Negotiations between Kaliff and Brody culminated in a "Surplus Lines General Agency Agreement" (the Agreement) entered into on July 22, 1975, about one month after defendant Frank B. Hall & Co. of Texas acquired the Kaliff Agency. Brody and Kaliff, who had remained with the company as an officer after the acquisition, signed the Agreement on behalf of their principals. Under the Agreement, defendants would act as a broker of amusement risks for plaintiff.

In October 1977, plaintiff ended its relationship with defendants citing as its reason a high loss ratio on business defendants had submitted. At about the same time, plaintiff ceased insuring any amusement businesses, including those solicited by companies other than defendants.

In 1978, defendants realized that their records reflected large amounts of "service fee income" consisting of add-on charges made

both to insureds and insurers, and that Kaliff's amusement park clients were among those overcharged. Defendants discharged Kaliff, notified the Texas Department of Insurance of their findings, and hired an accounting firm to assist in their inquiry regarding the service fee income. Because the ensuing investigation disclosed that a large portion of the overcharges were illegal under Texas law, it was determined that with regard to insureds for whom defendants had no rate-making authority, the insureds, rather than the insurers, were owed restitution on the overcharges. The Texas Department of Insurance administered the restitution program.

After plaintiff learned of defendants' restitution program—apparently through media coverage—it filed suit in the circuit court of Cook County seeking from defendants compensatory damages and $20 million in punitive damages. The case proceeded to trial on plaintiff's fifth amended complaint, which contained two counts: fraud and "willful and wanton acts or omissions." Plaintiff claimed that defendants charged insureds more for premiums than had been quoted to plaintiff and retained the difference rather than remitting the entire premium to plaintiff.

Over defendants' objection, the trial court granted plaintiff's motion *in limine* to prevent defendants from presenting any evidence regarding its restitution program, the judge having rejected defendants' counsel's argument that the restitution program was relevant to the issues of defendants' intent and punitive damages. The court reasoned that the restitution program would be relevant to defendants' intent to defraud insureds, but not to its intent regarding plaintiff.

Kaliff's testimony was presented at trial through an evidence deposition in which he described the service fee income as add-on charges to cover the cost of doing business. He further testified that service fee income appeared on the company books which defendants had access to both before and after the sale of his agency, and that since defendants conducted regular audits of the books for his clients they would have been aware of the charges. Kaliff also stated that as to those risks for which defendants lacked rate-making authority, they charged the insured the agreed upon premium plus the service fee, and the insurer received the entire amount of premium it requested from defendants. Joel Kornreich, vice-president in charge of corporate development for defendants, disputed that defendants were aware of the service fee income prior to their acquisition of the Kaliff Agency.

Brody testified that, as far as he knew, Kaliff did not misrepresent the nature of any risks nor did he ever fail to pay plaintiff.

Richard Pepelea, plaintiff's vice-president in charge of underwriting, calculated plaintiff's damages at $114,953 based on his review of defendants' files. Defendants objected that these files were not authenticated and that some of plaintiff's files were intermingled with defendants' files, but the court overruled the objection. Defendants refused to stipulate to the amount of overcharges because the court would not permit the stipulation to include the fact that policyholders were reimbursed therefor. On cross-examination, Pepelea conceded that plaintiff received all the money it had billed defendants on the amusement park accounts.

At the close of plaintiff's case, the court granted defendants' motion for a directed verdict as to the willful and wanton acts or omissions count, but denied it as to the fraud count; and when defendants renewed their motion for a directed verdict at the close of their case, the court again denied it. Over defendants' objection, the court instructed the jury that it had to find defendants liable for compensatory damages before it could award punitive damages.

The jury, in its answer to a special interrogatory, found that the "disputed amount of money" belonged to plaintiff rather than its policyholders. It awarded plaintiff $100 in compensatory damages and $250,000 in punitive damages. Plaintiff appeals from the denial of its post-trial motion seeking judgment *n.o.v.* on the compensatory damages portion of the verdict, and from the court's denial of prejudgment interest on plaintiff's "proven" compensatory damages or, in the alternative, additur on plaintiff's "proven" compensatory damages and prejudgment interest, or a new trial on the issue of compensatory damages only; defendants cross-appeal from the judgment entered against them.

A motion for a directed verdict or for a judgment *n.o.v.* should be granted only when all of the evidence viewed in a light most favorable to the opponent so overwhelmingly favors the movant that no other verdict could stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14; see also *Fitzpatrick v. ACF Properties Group, Inc.* (1992), 231 Ill. App. 3d 690, 709, 711-12, 595 N.E.2d 1327, 1340-42, *appeal denied* (1992), 146 Ill. 2d 626, 602 N.E.2d 451 (applying the standard set forth in *Pedrick* to an appeal of a directed verdict in a fraud action).

■■ Fraud in its general sense includes "any act, omission, or concealment calculated to deceive, including silence, if accompanied by deceptive conduct or suppression of material facts constituting an act of concealment." (*Farm Credit Bank v. Isringhausen* (1991), 210 Ill. App. 3d 724, 727, 569 N.E.2d 235, 237, citing *Rybak v. Provenzale* (1989), 181 Ill. App. 3d 884, 899, 537 N.E.2d 1321, 1331.) Under Illinois

law, a cause of action for fraud consists of five elements: (1) a false statement of material fact; (2) by one who knows or believes it to be false; (3) made with the intent to induce action by another in reliance on the statement; (4) action by the other in reliance on the truthfulness of the statement; and (5) injury to the other resulting from that reliance. (*Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286, 402 N.E.2d 599, 601; *Tan v. Boyke* (1987), 156 Ill. App. 3d 49, 54, 508 N.E.2d 390, 393, *appeal denied* (1987), 116 Ill. 2d 577, 515 N.E.2d 127.) The intentional omission or concealment of a material fact may be the basis of a fraud action if a special or fiduciary relationship exists which gives rise to the duty to speak. (*Lidecker v. Kendall College* (1990), 194 Ill. App. 3d 309, 317, 550 N.E.2d 1121, 1126.) A statement of a material fact is one upon which the plaintiff could reasonably rely in determining whether or not to act. Injury is measured by the harm the plaintiff suffered rather than by any benefit the defendant received. (*Shah v. Chicago Title & Trust Co.* (1983), 119 Ill. App. 3d 658, 660, 457 N.E.2d 147, 150.) Plaintiffs must prove fraud by clear and convincing evidence. (*Lidecker*, 194 Ill. App. 3d at 314, 550 N.E.2d at 1124.) Because we agree with defendants that plaintiff failed to show the element of injury, we limit our discussion to that issue.

■ We have consistently and emphatically held that plaintiffs' injuries in fraud actions must directly and proximately result from defendants' misrepresentations and cannot be assessed upon mere speculation or hypothetical assumptions. *E.g.*, *Spiegel v. Sharp Electronics Corp.* (1984), 125 Ill. App. 3d 897, 901-02, 466 N.E.2d 1040, 1044; *Shah*, 119 Ill. App. 3d at 622, 457 N.E.2d at 149; see also W. Keeton, Prosser & Keeton on Torts § 110, at 765 (5th ed. 1984) (stating that a plaintiff cannot recover if he is no worse off as a result of the defendant's misrepresentation "however flagrant it may have been, as where for example he receives all the value that he has been promised").

In *Shah*, the plaintiffs had entered into a contract to purchase a condominium from defendants, and they alleged that they were fraudulently induced to enter into an escrow agreement when the defendants claimed that they were the legal and beneficial owners of the property. In fact, the condominium was encumbered, and the defendants did not become the legal and beneficial owners of the property until over three months after the parties entered into the escrow agreement. (*Shah*, 119 Ill. App. 3d at 659, 457 N.E.2d at 149.) Because the plaintiffs failed to explain precisely how they were damaged by the defendants' misrepresentations, the trial court entered summary judgment in favor of the defendants. We affirmed,

holding that proof of injury "resulting from *** fraudulent misrepresentations is an essential element of actionable fraud." *Shah*, 119 Ill. App. 3d at 661, 457 N.E.2d at 150.

The *Spiegel* plaintiffs also failed to show how the defendant's misrepresentation injured them. They claimed that a retailer acted as the defendant supplier's agent and falsely claimed to be a factory-authorized Sharp dealer. The plaintiffs brought suit under a fraud theory when a copier they bought from the alleged agent malfunctioned. We affirmed the trial court's dismissal of the plaintiffs' fraudulent misrepresentation counts, finding that their injury did not result from the purported agent's misrepresentation regarding its status as an authorized dealer, but rather resulted from the copier's poor performance. *Spiegel*, 125 Ill. App. 3d at 901-03, 466 N.E.2d at 1044-45.

We again stressed the necessity of proving injury in *Kelman v. University of Chicago* (1988), 166 Ill. App. 3d 137, 519 N.E.2d 708, *appeal denied* (1988), 122 Ill. 2d 576, 530 N.E.2d 246. In that case, the plaintiff had been exposed to a toxic substance during the course of his employment and developed berylliosis, a lung disease commonly associated with such exposure. He experienced lung problems and his employer had periodically provided him with physical examinations, but no physician had ever disclosed the possibility of his developing the disease. The plaintiff sued his employer and a number of physicians on a fraud theory. We affirmed the trial court's grant of summary judgment in favor of the defendants because the plaintiff failed to show that the defendants' allegedly fraudulent conduct resulted in a worsening of his illness. The plaintiff did not rebut expert testimony that he suffered no physical impairment from a delay in treatment. Thus, "[o]n this unrefuted evidence that no damages resulted from the alleged fraud *** defendants were entitled to summary judgement as a matter of law." *Kelman*, 166 Ill. App. 3d at 142, 519 N.E.2d at 711.

Similarly, in *Lidecker*, the plaintiff nursing students failed to show that they were injured by their school's omitting to inform them prior to their enrollment that it was not eligible for accreditation. (*Lidecker*, 194 Ill. App. 3d at 315-17, 550 N.E.2d at 1124-25.) The plaintiff students claimed that they were injured because they had to repeat their junior year of study after transferring to an accredited school. We disagreed, noting that the school officials had fully informed the plaintiffs of the school's lack of accreditation during their sophomore year, and plaintiffs chose to remain at the school. In addition, the evidence indicated that the students' employment opportunities were not adversely affected by the school's accreditation

status. Thus, the plaintiffs failed to show injury proximately caused by the defendants' omissions. *Lidecker*, 194 Ill. App. 3d at 317, 550 N.E.2d at 1124-25.

■ The case at bar is indistinguishable from those discussed above. Although plaintiff's employees testified that they found overcharges to their insureds in defendants' books, it failed to completely explain how it was injured by those overcharges. Plaintiff received the benefit of its bargain when defendants remitted the agreed-upon premium payments. The Agreement authorized defendants to solicit and accept applications for insurance and collect and remit premium payments; it also obligated plaintiff to pay defendants commissions on the applications it accepted. Defendants did not have the power to bind plaintiff to amusement risks, all of which were subject to plaintiff's approval after it received relevant information on them from defendants. Brody testified that defendants did not mischaracterize the nature of any risks it solicited for plaintiff, and Pepelea testified that defendants paid plaintiff all the money due on the amusement accounts.

Plaintiff's assertion that it is entitled to benefit from defendants' admitted misconduct towards its customers not only defies logic, but it also distorts the law. Neither plaintiff nor defendants were entitled to funds illegally obtained from insureds.[1] As previously noted, the Agreement specifically withheld from defendants the power to bind plaintiff to risks. Plaintiff was ultimately responsible for approving premium rates. Thus, defendants' failure to disclose and remit the overcharges to plaintiff did not affect plaintiff as long as it received the amount of premium it approved. Indeed, by its own admissions, plaintiff suffered no actual damages as a result of defendants' overcharges. Additionally, as defendants point out, the jury verdict of a mere $100 in compensatory damages is indicative of plaintiff's failure to show actual damages; indeed, it appears to have resulted from the jury's having been instructed (correctly, to be sure) that it would have to find defendants liable for compensatory damages before it could award punitive damages. For purposes of proving fraud, therefore, defendants' failure to reveal to plaintiff the overcharges it

---

[1] As we informed both counsel at oral argument, we find the instant matter a not inappropriate analogy to the early eighteenth century Highwayman's Case, *Everet v. Williams*, Exchequer (Orders, vol. 34), Mich. T. 12 Geo. I, 1725 (No. 43), October 30, 1725, in which a highwayman filed a bill in equity for an accounting against his partner. The court responded to the "scandalous and impertinent" bill by fining both parties' attorneys and ordering that both the plaintiff and the defendant be drawn and quartered. See IX L. Q. Rev. 197 (1893).

made to insureds is irrelevant in view of the fact that plaintiff was not injured by the nonpayment of those overcharges.

Plaintiff alleged in its complaint that the Agreement "constituted a fiduciary relationship between the parties with all the rights and duties related thereto." Consequently, plaintiff argues, defendants had a duty to disclose and remit the overcharges. The trial judge found that an agency relationship existed between plaintiff and defendants and that, as a result, a fiduciary relationship arose. The jury was thus instructed that plaintiff claimed that "defendants committed fraud and breached their fiduciary duty to the plaintiff." However, defendants assert, as they did in the lower court, that they were brokers of plaintiff's policies and not plaintiff's agent, and that the duties they owed to plaintiff did not extend beyond the terms of the Agreement.

A fiduciary relationship may arise as a matter of law by virtue of the parties' relationship, *e.g.*, attorney-client, or it may arise as a result of the special circumstances of the parties' relationship where one places trust in another so that the latter gains superiority and influence over the former. (*In re Estate of Rothenberg* (1988), 176 Ill. App. 3d 176, 179, 530 N.E.2d 1148, 1150.) When a fiduciary relationship does not arise as a matter of law, the party asserting a fiduciary relationship has the burden of proving its existence by clear and convincing evidence. (See *Rothenberg*, 176 Ill. App. 3d at 179, 530 N.E.2d at 1150.) An agency is "a consensual, fiduciary relationship between two legal entities" whereby "the principal has the right to control the conduct of the agent, and the agent has the power to effect the legal relations of the principal." (*Gunther v. Commonwealth Edison Co.* (1984), 126 Ill. App. 3d 595, 598, 467 N.E.2d 1104, 1106; see also Restatement (Second) of Agency §§ 1, 13, at 7, 58-60 (1958).) Thus, once an agency relationship is found, a fiduciary relationship arises as a matter of law.

We agree with defendants that they acted as brokers, and not general agents, of plaintiff. Under Illinois law, brokers are ordinarily agents of insureds, not insurers. A broker is defined as one who acts as " 'a middleman between the insured and the insurer, who solicits insurance business from the public under no employment from any special company ***. An agent is an individual who has a fixed and permanent relation to the companies he represents and who has certain duties and allegiances to such companies.' [Citation.]" (*Zannini v. Reliance Insurance Co.* (1992), 147 Ill. 2d 437, 451, 590 N.E.2d 457, 462-63; see also *Krause v. Pekin Life Insurance Co.* (1990), 194 Ill. App. 3d 798, 804-05, 551 N.E.2d 395, 399.) However, brokers may be the agents of insurers to a limited extent when, for example, they

perform such functions as collecting and remitting premiums to the insurer.[2] Once the limited purpose for which the broker's agency is established has been fulfilled, the broker owes no ongoing fiduciary duty to the ex-principal. (*Penrod v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1979), 68 Ill. App. 3d 75, 80, 385 N.E.2d 376, 380 (defendant stockbroker was not customers' agent for purposes of informing them of tender offer when customers expressed no desire for broker to act as their agent in that regard, even though broker previously had handled several transactions for customers).) The determination of whether a party acted as an agent of the insured or insurer is a question of fact based on the party's conduct rather than his or her title. *E.g., Zannini,* 147 Ill. 2d at 450-51, 590 N.E.2d at 463-64 (broker was agent of insurer for purposes of binding company to tenant insurance policy when agency-company agreement gave him express authority to bind coverage); *Krause,* 194 Ill. App. 3d at 804-05, 551 N.E.2d at 400 (broker was not an agent of insurer when he lacked authority to bind the insurer); *Budget Premium Co. v. Inter-Insurance Exchange* (1965), 55 Ill. App. 2d 277, 280-81, 204 N.E.2d 310, 311-12 (broker was not an agent of insurer when parties' conduct did not indicate an agency relationship; therefore, insurer was not liable for broker's failure to remit premiums to premium financing agency); see also 3 Couch on Insurance 2d § 25:93, at 442-44 (M. Rhodes rev. 1984) (brokers are usually agents of insureds even though insurers compensate them; they may, however, act as agents of insurers when, for example, they deliver policies to insureds or transmit premiums to insurers).

A statute may also define the relationship between brokers and agents. During the relevant period of this litigation, section 505 of the Illinois Insurance Code provided that brokers were fiduciaries of insurers for purposes of the portion of premiums they collected for insurers. (Ill. Rev. Stat. 1973, ch. 73, par. 1065.52 (repealed by Pub. Act 83—801, § 3, eff. January 1, 1985).) However, the purpose of that provision was to protect the public from brokers' misappropriation of premiums, and not to alter the general rule that brokers are in-

---

[2]Plaintiff contends that the Illinois Supreme Court in *Zannini* based its holding on *Wille v. Farmers Equitable Insurance Co.* (1967), 89 Ill. App. 2d 377, 232 N.E.2d 468, and that the court there held that an insurance agency with no authority to bind an insurer was nonetheless an agent of the insurer. However, plaintiff misapprehends both *Wille* and *Zannini.* In *Zannini,* the supreme court read *Wille* to stand for the proposition that an insurance broker can be an agent of an insurer for a limited purpose, such as soliciting insurance, while not thereby becoming a general agent of the insurer. *Zannini,* 147 Ill. 2d at 452, 590 N.E.2d at 463.

sureds' agents. See *Davidson v. Comet Casualty Co.* (1980), 89 Ill. App. 3d 720, 724, 412 N.E.2d 19, 22-23.

Here, the Agreement delineated the relationship between plaintiff and defendants. (See Restatement (Second) of Agency § 376, at 173-74 (1958) (an agent's duties to its principal are determined by the agreement between the parties as interpreted in light of the surrounding circumstances).) Under the Agreement, defendants were brokers or "producers" for plaintiff. Defendants were not plaintiff's general agents; they were plaintiff's agents for specific purposes outlined in the Agreement, such as soliciting business and collecting and remitting premiums.[3] The record is devoid of any evidence that the parties deviated from the terms of their agreement. Since defendants had no power to bind plaintiff, they acted as agents of the insureds when charging them for the cost of insurance. Thus, defendants had no duty to disclose and remit to plaintiff overcharges they made to insureds. See *State Security Insurance Co. v. Burgos* (1991), 145 Ill. 2d 423, 433-34, 583 N.E.2d 547, 551-52 (broker was agent of insurer for purposes of receiving notice of occurrence when course of dealing between broker and insured created an apparent authority in broker to act as insurer's agent for purposes of handling all notices).

Moreover, plaintiff failed to show special circumstances which would warrant a finding of a fiduciary relationship. The mere fact that business transactions occurred or that a contractual relationship existed is insufficient to support such a finding. (See *Pottinger v. Pottinger* (1992), 238 Ill. App. 3d 908, 918, 605 N.E.2d 1130, 1138; *Schuppenhauer v. Peoples Gas Light & Coke Co.* (1975), 30 Ill. App. 3d 607, 613, 332 N.E.2d 583, 589, *cert. denied* (1976), 425 U.S. 937, 48 L. Ed. 2d 178, 96 S. Ct. 1670.) The relevant factors in determining whether a fiduciary relationship exists include: the degree of kinship between the parties; the disparity in age, health, and mental condition, education, and business experience between the parties; and the extent to which the allegedly "servient party" entrusted the handling of its business affairs to the "dominant party" and placed its trust and confidence in it. (*Pottinger*, 238 Ill. App. 3d at 917, 605 N.E.2d at 1138-39; *Rothenberg*, 176 Ill. App. 3d at 180-81, 530 N.E.2d at 1151.) Generally, where parties capable of handling their business

---

[3]*Martin v. Heinold Commodities, Inc.* (1985), 139 Ill. App. 3d 1049, 487 N.E.2d 1098, *rev'd in part on other grounds* (1987), 117 Ill. 2d 67, 510 N.E.2d 840, cited by plaintiff for the proposition that a broker is a fiduciary of the insurer, is inapposite. The *Martin* court discussed the fiduciary obligations of brokers to their customers, the insureds.

affairs deal with each other at arm's length, and there is no evidence that the alleged fiduciary agreed to exercise its judgment on behalf of the alleged servient party, no fiduciary relationship will be deemed to exist. *De Witt County Public Building Comm'n v. County of De Witt* (1984), 128 Ill. App. 3d 11, 26, 469 N.E.2d 689, 700.

Here plaintiff claims that it relied on defendants' expertise in the area of insuring amusement enterprises. However, Brody testified that while defendants recommended premium rates, plaintiff "determined whether we would set that as a price for the risk" and that "once or twice" plaintiff did not accept defendants' recommendation. Furthermore, the terms of the Agreement denying defendants the power to bind plaintiff belie any notion that plaintiff was a servient party placing its trust and confidence in defendants' recommendations on the appropriate premium rates for these risks. A party " 'cannot create a legal obligation or status by pleading ignorance *** to an opposing party in a business transaction. Those who have in the law's view been strangers remain such, unless both consent by word or deed to an alteration of that status.' " (*De Witt*, 128 Ill. App. 3d at 27, 469 N.E.2d at 701, quoting *Southern Trust Co. v. Lucas* (8th Cir. 1917), 245 F.2d 286, 288.) In the present case, plaintiff failed to show that a fiduciary relationship arose by operation of law or by the existence of circumstances from which we could infer that plaintiff entrusted defendants to conduct its business or handle its affairs. Even if defendants were obligated to disclose overcharges made to insureds, plaintiff failed to show it was injured by defendants' nondisclosure, as we have explained above.

In conclusion, the law is well settled that a plaintiff cannot prevail in a fraud action without showing injury. Clearly, defendants wrongfully overcharged insureds. However, this in no way injured plaintiff, who received all agreed-upon premium payments. Furthermore, we find that public policy considerations obviously militate against our allowing plaintiff to benefit financially from defendants' illegally overcharging insureds for premiums. Viewing the evidence in the light most favorable to plaintiff, we hold that the jury's verdict finding fraud cannot stand and that the trial court erred in denying defendants' motion for judgment *n.o.v.*

Reversed.

HARTMAN and McCORMICK, JJ., concur.