FLOYD RANSOM *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. A.B. DICK COMPANY, Defendant-Appellee and Cross-Appellant.

First District (5th Division)   No. 1—95—0953

Opinion filed June 27, 1997.

Debra A. Thomas and Harry C. Lee, both of Chicago, for appellants.

McDermott, Will & Emery, of Chicago (John R. Doyle and Anne Pramaggiore, of counsel), for appellee.

JUSTICE HOURIHANE delivered the opinion of the court:

Plaintiffs, Floyd Ransom, Ransom S.A. de C.V., a Mexican corporation, and Angel Sayago M., as the trustee in bankruptcy of Floyd Ransom S.A. de C.V., brought an action for breach of contract, breach of fiduciary duty and interference with prospective economic advantage against the defendant, A.B. Dick Co. (A.B. Dick), an Illinois corporation. Defendant answered and counterclaimed seeking enforcement of two promissory notes executed by plaintiffs and payment of an outstanding account. A trial was held and the jury returned verdicts (1) awarding plaintiffs $1,050,000 on their breach of fiduciary duty claim, (2) finding for defendant on all of plaintiffs' other claims, and (3) awarding defendant $1,076,830.52 on its counterclaim. The verdict for the plaintiffs was offset against the verdict for the defendant and defendant was awarded $26,830.52. Plaintiffs now appeal from the denial of their post-trial motions and from those verdicts in defendant's favor. Defendant has also filed a cross-appeal from the judgment for the plaintiffs on their breach of fiduciary duty claim.

On appeal, plaintiffs seek resolution of the following issues: (1) whether the trial court abused its discretion when it refused to grant comity to the Mexican bankruptcy court; (2) whether the trial court committed reversible error in allowing evidence of post-bankruptcy interest on the promissory notes and subsequently directing the jury to award interest on those notes; and (3) whether the trial court abused its discretion in offsetting the verdicts.

On cross-appeal, defendant argues that the verdict awarding plaintiff $1,050,000 was against the manifest weight of evidence.

## BACKGROUND

The relationship between the parties began in 1968 when Ransom S.A. de C.V., a Mexican corporation engaged in the business of selling office equipment and supplies, obtained the exclusive rights to sell the reprographic and copier products of defendant, A.B. Dick, in Mexico. This functional arrangement derived from two agreements between the parties. First, on December 31, 1968, representatives of Ransom S.A. de C.V. and those of a Mexican subsidiary of A.B. Dick

entered into an agreement to form a joint venture (Ransom A.B. Dick S.A. de C.V.). This agreement specifically provided that Ransom S.A. de C.V. would buy 51% of the stock of A.B. Dick's Mexican subsidiary and together the parties would attempt to expand A.B. Dick's share in the Mexican market. Second, on February 23, 1970, the parties entered a "Distributor Sales and Customer Service Contract," which provided that Ransom A.B. Dick S.A. de C.V. would be the exclusive distributor of A.B. Dick's products in Mexico.

After several years of successful and profitable operation, Floyd Ransom and Sons, the owners of Ransom S.A. de C.V., purchased defendant's 49% interest in the joint venture. Additionally, at this time the distributorship agreement between the parties was amended to include a five-year exclusive distributorship term with one automatic five-year renewal. Following this change in ownership, A.B. Dick representatives regularly attended Ransom A.B. Dick S.A. de C.V. business meetings and were furnished with the company's financial and business plans.

On August 31, 1976, the government of Mexico announced a devaluation of the peso. As a result, Ransom A.B. Dick S.A. de C.V. experienced an increase of debt and an increase in expenses associated with buying the defendant's products. In response, the Ransom family merged their various business ventures into a single entity, Ransom S.A. de C.V. (hereinafter Ransom company). Financial difficulties plagued the Ransom company in the following years. During this time, A.B. Dick guaranteed a loan to the Ransom company, which was used to pay A.B. Dick. By 1980, the Ransom company had recovered from the 1976 devaluation of the peso and was performing to the satisfaction of the defendant under the distributorship agreement.

In February of 1982 the Mexican government again devalued the peso. As a result, the Ransom company faced another instantaneous increase of debts and expenses. Subsequent devaluations of the peso in the following years worsened the Ransom company's financial situation. In order to allay defendant's concerns, the Ransom company paid a part of its debt to defendant and obtained a loan for $350,000 from the El Paso National Bank which it used to satisfy its outstanding debt to defendant. Defendant again guaranteed this loan.

During this period of financial difficulties, representatives of A.B. Dick continued to attend Ransom company meetings and provided advice for solving its debt problems. A.B. Dick also sent Clifford Mack, its chief financial officer, to assist the Ransom company in developing a business plan and prospectus to attract new investors. Around the same time, Mack wrote a letter to defendant that stated that it was

"important to keep distributor alive as no other alternative distributor [has been] found as yet." When the Ransom company became further indebted, representatives of the defendant advised that the Ransom company should again refinance its debt rather than file for bankruptcy. In 1984, the promissory note was reissued by El Paso National Bank for $277,083.34 and defendant again guaranteed the loan (hereinafter known as El Paso Bank Note). A second promissory note was issued for the remaining $192,837 that plaintiff owed to defendant (hereinafter Ransom Note).

The Ransom company continued as the defendant's exclusive distributor and was able to stay current on its interest payments for a short time. However, in 1985 the Ransom company again experienced financial problems. On September 5, 1985, the Ransom company sought and received a declaration of "suspension of payments" from the Mexican bankruptcy court. In November of 1985, the Ransom company did not make the required interest payments on the El Paso Bank Note, and the bank sent the Ransom company a notice of default that indicated the bank's intention to accelerate the debt. Thereafter, defendant paid the balance on the note and was assigned the bank's interest.

At about the same time, defendant instructed one of its employees, Rafael Alleguez, to assist the Ransom company in finding a buyer for the company. Alleguez put the Ransom company representatives in contact with Sanchez Y Compania (hereinafter Sanchez company). Ransom met with representatives of the Sanchez company and provided them with a variety of information on the Ransom company. At the conclusion of their meetings and discussions with the Ransom company, representatives of the Sanchez company indicated no interest in the investment in, or purchase of, the Ransom company.

In March of 1986, defendant informed plaintiff that it intended to secure a new distributor of its products, and on July 14, 1986, defendant appointed the Sanchez company as the new exclusive distributor of defendant's office products.

On November 4, 1986, defendant presented a claim to the Mexican bankruptcy court for the El Paso note. On June 4, 1987, the Ransom company filed a three-count complaint against the defendant in the circuit court of Cook County alleging a violation of the Illinois Franchise Disclosure Act of 1987 (Ill. Rev. Stat. 1987, ch. 121½, par. 1701 *et seq.*), inequitable conduct in the course of dealings, and fraud. On December 10, 1987, the Ransom company petitioned the Mexican court for conversion to bankruptcy. On March 7, 1988, the Mexican bankruptcy court declared the Ransom company in a state of bankruptcy and appointed Angel Sayago M. as receiver. This order of the

Mexican court also prohibited the Ransom company from making any payments to or transferring assets to creditors.

On March 22, 1989, the Ransom company filed a second amended complaint in the circuit court of Cook County alleging violations of the Franchise Disclosure Act, breach of contract, breach of fiduciary duty and intentional interference with prospective economic advantage. Defendant answered and filed a counterclaim seeking principal and interest on a remaining open account and on the El Paso and Ransom notes.

Plaintiffs subsequently moved to dismiss the counterclaim alleging that defendant's counterclaims were inappropriate because the claims had already been filed with, and acknowledged and prioritized by, the Mexican bankruptcy court. Plaintiffs' motion was denied. Plaintiffs refiled the same motion before a second judge and it was granted.

Immediately before trial, however, a third judge hearing the case allowed the defendant to reinstate its counterclaim based on the promissory notes. In reaching his determination, the trial judge stated:

> "It does seem to me to be equitable [sic] to allow someone to bring in a company and not allow them to counterclaim. Especially when one of the arguments you made in your brief, Mr. Bayless, was you know how unfair is it [sic] that a nonresident can come in and sue a resident and the resident is forbidden or prohibited or barred from bringing a counterclaim ***.
>
> But I do think it is a waste of effort for everybody to have a trial on the very same transactions and not get rid of the whole thing and resolve all of the dispute. So I am going to reinstate the counterclaim and grant your motion."

At the subsequent trial, defendant was allowed to introduce evidence of the interest that had accrued on the notes in question, and the trial court instructed the jury that the interest on the notes should be awarded if the jury found in the defendant's favor on the counterclaim. The jury returned a verdict of $1,050,000 for the plaintiff on its breach of fiduciary duty claim against the defendant. The jury also returned verdicts totaling $1,076,830.52 for defendant on its counterclaims.[1] The trial court then offset defendant's verdicts

---

[1]The award for the defendant consisted of a verdict for $8,598.80 ($6,145.48 in principal and $2,453.32 in interest) on the open account with the plaintiff, a verdict for $416,623.24 ($152,939.64 principal and $263,683.60 in interest) on the promissory note from plaintiff to defendant, and a verdict for $651,608.48 ($277,083.34 for principal and $374,525.14 in interest) on the

against plaintiffs' verdict and entered judgment for defendant for $26,830.32.

## DISCUSSION

### Plaintiffs' Appeal

On appeal, plaintiffs contend that the trial court abused its discretion when it allowed the defendant to reinstate its counterclaim. Plaintiffs assert that because defendant's counterclaim was based on promissory notes and other debt that had been "adjudicated" by the Mexican bankruptcy court, under the doctrine of comity, the trial court should have afforded deference to the ruling of the Mexican court and denied defendant's request to reinstate its claims.

■ While the doctrine of comity is one that has long been accepted by the courts in this state (*Nelson v. Hix*, 122 Ill. 2d 343, 522 N.E.2d 1214 (1988); *Rollins v. Ellwood*, 141 Ill. 2d 244, 565 N.E.2d 1302 (1990)), the specific questions presently raised regarding the application of that doctrine do not appear to have been previously broached. In the absence of guidance from our courts on this issue, we look to the manner in which courts from other jurisdictions have resolved similar issues.

Comity is a rule of practice through which a court in this state may take notice of, and defer to, the laws and judicial decisions of a foreign jurisdiction out of respect, goodwill and cooperation.[2] *Schoeberlein v. Purdue University*, 129 Ill. 2d 372, 378, 544 N.E.2d 283 (1989); *Safety-Kleen Corp. v. Canadian Universal Insurance Co.*, 258 Ill. App. 3d 298, 306, 631 N.E.2d 475. Comity is to be accorded an act of a foreign court as long as that court is of competent jurisdiction and as long as the laws and the public policy of the forum state are not violated. *Daniels v. Powell*, 604 F. Supp. 689 (N.D. Ill. 1985); *Schoeberlein*, 129 Ill. 2d at 378-79. Illinois courts have granted comity to the law of a foreign jurisdiction in the absence of evidence that such recognition would be repugnant to Illinois policy or prejudicial to Illinois interests. See *Hall v. Woods*, 325 Ill. 114, 156 N.E. 258 (1927). A decision by the trial court to grant or deny comity will not

---

promissory note assigned defendant from El Paso National Bank.

[2]Judicial comity should not be confused with "conflict of laws," the doctrine whereby an Illinois court will apply the theoretical constructs of the Restatement (Second) of Conflict of Laws to determine whether a foreign jurisdiction has such a relationship to the parties as to necessitate the application of the foreign jurisdiction's law to the case. Comity is an older doctrine, grounded in respect for the authority of another jurisdiction. *Safety-Kleen Corp. v. Canadian Universal Insurance Co.*, 258 Ill. App. 3d 298, 306-07 (1994).

be reversed absent an abuse of discretion. *Safety-Kleen Corp.*, 258 Ill. App. 3d at 308.

■ In the present case, the trial court abused its discretion in granting defendant's motion to reinstate its counterclaim and denying comity without first conducting a hearing. A determination of whether to grant comity to the laws of another jurisdiction necessarily requires an examination of those laws and their application in order to reach a reasoned decision regarding their compatibility with the interests and policies of this state. Accordingly, we find that the trial court abused its discretion in making this determination without first undertaking an examination of the nature and effect of the Mexican bankruptcy code and its compatibility with the interests and policies of this state.

In determining what procedure should be employed by the trial court when addressing questions of comity related to foreign bankruptcy proceedings, we find it helpful to examine the reasoning and procedures employed by federal courts.[3] In *Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.*, 44 F.3d 187 (3d Cir. 1994), and *Remington Rand Corp.-Delaware v. Business Systems Inc.*, 830 F.2d 1260 (3d Cir. 1987), the Third Circuit Court of Appeals was faced with similar questions regarding the extension of comity to the rulings of a foreign bankruptcy court. In both cases, the court recognized that once a party had made a specific request for the extension of comity, a reasoned decision could only follow an ascertainment of the foreign laws and procedures.

In *Philadelphia Gear* the court outlined procedures for addressing a party's claim that comity should be afforded the decisions of a foreign bankruptcy court. First, a party seeking to stay a proceeding in the federal court based on the existence of foreign bankruptcy proceedings must present a *prima facie* case that the extension of comity is appropriate. A *prima facie* case consists of a demonstration that the foreign bankruptcy court shares this country's policy of the equal distribution of assets among similarly situated creditors and that the foreign law mandates or permits the issuance of a stay of all proceedings related to the bankruptcy. *Philadelphia Gear*, 44 F.3d at 193. If the party seeking the extension of comity makes such a show-

---

[3]It is worthy of notation that, while the resolution of the present issue in the courts of this state is not prohibited, there appears to be an expressed congressional preference for handling complicated disputes of this nature in the better equipped bankruptcy courts of the United States. See 11 U.S.C. § 304 (1982); *Cunard Steamship Co. v. Salen Reefer Services AB*, 773 F.2d 452 (2d Cir. 1985), citing Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 137, 93rd Cong., 1st Sess., Part II, 71 (1973).

ing, the court should consider the matter further and, in doing so, may have to conduct an evidentiary hearing with expert witnesses to ascertain foreign law and procedures. *Philadelphia Gear*, 44 F.3d at 193-94. The specific questions to be answered by the trial court during this more exacting inquiry include: (1) whether the foreign court is a duly authorized tribunal; (2) whether the foreign bankruptcy law provides for the equal treatment of creditors; (3) whether a stay of the action in the United States would be in some way inimical to this country's policy of equality; and (4) whether the nonmoving party will be prejudiced by the stay. *Philadelphia Gear*, 44 F.3d at 193-94.

While we do not feel compelled to adopt the particular procedure outlined by the court in *Philadelphia Gear*, we nonetheless find the reasoning of that decision persuasive and the procedure instructive. Accordingly, we hold that a party in the courts of this state seeking the extension of comity to the proceedings of a foreign bankruptcy court must make a minimal or *prima facie* showing of the existence of such proceedings along with a showing that those proceedings, should they be recognized in this state through the extension of comity, would have an effect on the claim before the court, *i.e.*, that a stay is in effect and would foreclose the current claim.

Once a party has made such a showing, the trial court should conduct an evidentiary hearing, when necessary, in order to determine whether the law of that jurisdiction offends the public policy of Illinois or the general interests of its citizens. At this stage, it is appropriate for the court to consider the similarity of objectives between the foreign bankruptcy laws and those of the United States as well as whether the grant of comity will prejudice the nonmoving party. Additionally, the trial court should memorialize the factual basis of its decision in order to permit subsequent review.

■ In the present case, after the defendant filed its counterclaim in the trial court, plaintiffs filed a motion to dismiss pursuant to section 2—619 of the Code of Civil Procedure (735 ILCS 5/2—619 (West 1994)) alleging that principles of comity foreclosed the claim. Plaintiffs' initial motion was denied. Plaintiffs subsequently refiled the motion when the cause was before a different trial judge and it was granted. Thereafter, a third judge sitting on the case allowed the defendant to reinstate its counterclaim over plaintiffs' objections.

In the course of arguing this motion for the third time, plaintiffs clearly asserted the existence of the Mexican bankruptcy court proceedings and argued that application of Mexican bankruptcy law would foreclose defendant's counterclaim because of a stay provision similar to that contained in the bankruptcy laws of the United States. Accordingly, plaintiffs met the threshold requirement and established

a *prima facie* case for the extension of comity and the recognition of, and deference to, the authority of the Mexican bankruptcy court. It was therefore incumbent upon the trial court to examine the nature and provisions of the Mexican bankruptcy laws and determine whether they in some way offended the policies of this state. Because the trial court failed to conduct such an evaluation, we must remand this matter to the circuit court.

Pursuant to this court's equitable powers under Supreme Court Rule 366 (155 Ill. 2d R. 366), we vacate the order of the trial court which reinstated defendant's counterclaim, remand this matter to the circuit court for a hearing and determination on the issue of comity and retain jurisdiction pending that decision. Thereafter, the parties will be permitted to supplement their briefs for our further consideration of the comity issue.

### Defendant's Cross-Appeal

On cross-appeal, defendant contends that the jury award of $1,050,000 to plaintiffs on their breach of fiduciary duty claim was against the manifest weight of evidence. Defendant argues that there was a complete absence of evidence to support a finding that it owed a fiduciary duty to the Ransom company or that it breached any such duty proximately resulting in damages of $1,050,000 to the Ransom company.

■ A fiduciary relationship may arise in one of two ways. Particular relationships, such as attorney-client and principal-agent, constitute fiduciary relationships as a matter of law. See *Gunther v. Commonwealth Edison Co.*, 126 Ill. App. 3d 595, 467 N.E.2d 1104 (1984); Restatement (Second) of Agency §§ 1, 13, at 7, 58-60 (1958). Additionally, a fiduciary relationship and the attendant duties may arise as a result of the special circumstances of the parties' relationship, where one party places trust in another so that the latter gains superiority and influence over the former. *In re Estate of Rothenberg*, 176 Ill. App. 3d 176, 530 N.E.2d 1148 (1988); *State Security Insurance Co. v. Frank B. Hall & Co.*, 258 Ill. App. 3d 588, 630 N.E.2d 940 (1994). When the relationship is not one that gives rise to a fiduciary duty as a matter of law, the party asserting its existence has the burden of establishing such by clear and convincing evidence. *State Security Insurance Co.*, 258 Ill. App. 3d at 595.

■ As defendant correctly notes, ordinarily in a business transaction each party guards his own interests and no fiduciary duty exists. *State Security Insurance Co.*, 258 Ill. App. 3d at 598. Moreover, a distributorship arrangement does not, as a matter of law, give rise to a fiduciary duty. *Seaboard Seed Co. v. Bemis Co.*, 632 F. Supp. 1133

(N.D. Ill. 1986). Accordingly, plaintiffs in the present case had the burden of establishing the existence of a fiduciary relationship by clear and convincing evidence.

The relevant factors in determining whether a fiduciary relationship exists include: the degree of kinship between the parties; the disparity in age, health, mental condition and education and business experience between the parties; and the extent to which the "servient" party entrusted the handling of its business affairs to the "dominant" party and placed trust and confidence in it. *State Security Insurance Co.*, 258 Ill. App. 3d 588. Moreover, a fiduciary duty can arise if the dominant party agrees to exercise its judgment on behalf of the servient party. *De Witt County Public Building Comm'n v. County of De Witt*, 128 Ill. App. 3d 11, 26, 469 N.E.2d 689 (1984).

■ The plaintiffs argue on appeal that there was sufficient evidence to support a finding that, by virtue of the intimate working relationship between the Ransom company and defendant, a fiduciary relationship arose along with the attendant duty of the defendant to exercise utmost care, candor, loyalty and good faith in its dealings with the Ransom company. Plaintiffs point to defendant's access to the Ransom company's business plans, attendance and participation in its business meetings, extension of credit and a variety of other facts relating to their relationship in support of their claim that the parties had a special relationship.

The record contained sufficient evidence to support a finding by the jury that defendant owed a fiduciary duty to the Ransom company. The history of this relationship reveals that the defendant's representatives regularly attended Ransom company business meetings, were privy to its business plans and provided credit and guaranteed financial obligations of the company. Additionally, after the 1982 devaluation of the peso, representatives of the defendant attended monthly meetings where they made recommendations for resolving the Ransom company's debt problem and advised against filing for bankruptcy. Defendant assigned its chief financial officer, Clifford Mack, to help the Ransom company attract new investors. During the same period of time that Mack was helping the Ransom company develop a plan, Mack prepared a letter to defendant that advised the defendant that it was "important to attempt to keep distributor alive as no other alternative distributor [has been] found as yet." Mack analyzed the Ransom company's debt situation and proposed outlines for a prospectus designed to attract investors. Thereafter, defendant asked the Ransom company to refinance its debt and again guaranteed a loan from El Paso.

Once the Ransom company went into suspension of payments, de-

fendant directed Rafael Alleguez to assist Ransom in finding a buyer. Alleguez directed the Ransom company to contact Sanchez Y Compania as a prospective buyer. Ransom representatives contacted the Sanchez company and gave them detailed information regarding Ransom company customers and its internal operations. A short time later, defendant appointed the Sanchez company as the new distributor.

Based on these facts, the jury could reasonably conclude that a special relationship existed between defendant and the Ransom company and that the defendant breached its fiduciary duty to the Ransom company when it artificially prolonged the existence of the Ransom company until it could find a new distributor. Therefore, we cannot say that the verdict was against the manifest weight of the evidence. *Zavala v. St. Regis Paper Co.*, 256 Ill. App. 3d 736, 628 N.E.2d 405 (1993).

Likewise, there is sufficient evidence in the record to support the amount of the award as there was testimony that the A.B. Dick division of the Ransom company was valued at $2 million prior to its bankruptcy. The assessment of damages is a question of fact for the jury. While the amount awarded may not be speculative, it does not need to be proved with mathematical certainty. *Mohr v. Dix Mutual County Fire Insurance Co.*, 143 Ill. App. 3d 989, 493 N.E.2d 638 (1986). The jury must bring in a verdict that is in the range of valuation testimony presented. *City of Benton v. Odom*, 123 Ill. App. 3d 991, 463 N.E.2d 785 (1984). Here, the amount awarded plaintiffs was clearly within the range of valuation testimony presented at trial.

## Conclusion

■ Due to our ruling above, we believe that it would be in the interest of judicial economy for this court to retain jurisdiction over the remaining issues on appeal until such time as the trial court conducts a hearing and rules on the issue of comity. If the trial court rules that the doctrine of comity forecloses defendant's counterclaim, issues presently raised but not addressed on appeal will become moot. If, however, the trial court determines that granting comity would be inappropriate, we may consider that ruling along with all of the other errors already raised on appeal but not addressed in this opinion.

Accordingly, pursuant to the powers granted this court by Supreme Court Rule 366(a)(5) (155 Ill. 2d R. 366 (a)(5)), we affirm the judgment for the plaintiff in the amount of $1,050,000; direct the circuit court to stay enforcement of that judgment; remand this case to the circuit court with directions that a hearing be held solely on the is-

sue of whether the court should afford comity to the Mexican bankruptcy proceedings; and retain jurisdiction.

Affirmed in part and remanded with directions.

COUSINS, P.J., and McNULTY, J., concur.