**In re BULLOCK GARAGES, INC., Debtor.**

**Jeffrey D. Richardson, Chapter 7 Trustee, Plaintiff,**

**v.**

**Terry L. Bullock and T.L. Bullock Builders, Inc., Defendants.**

**Bankruptcy No. 02–93419.
Adversary No. 03–9066.**

United States Bankruptcy Court, C.D. Illinois.

Feb. 23, 2006.

Edward Brankey, Charleston, IL, for Debtor.

## OPINION

GERALD D. FINES, Bankruptcy Judge.

This matter having come before the Court for trial on the Amended Adversary Complaint filed by the Chapter 7 Trustee, Jeffrey D. Richardson; the Court, having heard sworn testimony and arguments of counsel and being otherwise fully advised in the premises, makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### Findings of Fact

In their opening statements, the parties essentially agreed that there were no seri-

ous disputes as to the material facts in this matter. The Court finds, after a thorough review of the transcript of trial and of the evidence deposition of Vicki McGuar, that the parties were correct. Additionally, the Court finds that all of the witnesses who testified in this matter were credible. As is often the case, the witnesses, at times, attempted to answer questions in a manner which they thought would best serve their side of the case. However, there was nothing in the testimony to support a finding that any particular witness was not credible.

The bankruptcy case underlying the instant adversary proceeding was filed by Debtor, Bullock Garages, Inc. (BGI) as a Chapter 11 proceeding on November 1, 2002. The Chapter 11 proceeding was subsequently converted to one under Chapter 7 in January 2003. In this adversary proceeding, the Chapter 7 Trustee, as Plaintiff, seeks a judgment against Defendant, Terry L. Bullock, and his company, T.L. Bullock Builders, Inc. (TLBB), in a three-count complaint concerning actions which the Defendants took in their relationship with BGI during a three week period in September 2002, shortly before the Debtor Corporation's Chapter 11 bankruptcy filing.

The Debtor Corporation, BGI, was formed in 1985, and became the majority shareholder of a previous corporation known as Curt Bullock Builders, Inc., which was formed in 1952, by Curt Bullock. This was a family business that was involved in the manufacture of pre-fabricated garages. Randy Bullock, the son of Curt Bullock, became the President of BGI upon its inception in 1985, and remained in that capacity until the business closed in January 2003, after the Debtor Corporation's conversion to Chapter 7 of the Bankruptcy Code.

BGI's manufacturing process took place in pre-fabrication mills located in four states. Although operating under the name of BGI, the evidence reveals that most of the real estate where the pre-fabrication mills were located and some of their equipment remained in the name of Curt Bullock Builders, Inc. BGI had control of all of the employees, most of the equipment, and received the income which the business generated. To market its product, BGI maintained a series of 65 company-owned sale offices. From these offices, BGI personnel sold garages to individuals who signed contracts to purchase the garages with BGI. Customers typically paid for their garage contracts in three stages, with one-third being paid when the garage contract was signed as a deposit, one-third being paid when BGI workers or sub-contractors poured the concrete floor for the garage, and the final third being paid when the garage was completed. BGI also maintained a series of independent dealers who signed contracts with customers to purchase garages built by BGI. Although these independent dealer contracts were between the dealer and the customer, the exclusive right to build the garage kit belonged to BGI. Terry Bullock, a nephew of Curt Bullock and a cousin of Randy Bullock, held an exclusive Bullock Garage dealership in Springfield, Bloomington, and O'Fallon, Illinois. Terry Bullock operated these dealerships under a corporation known as Terry Bullock Garages (TBG) under dealership agreements originally executed in the 1980's. Under these agreements, all pre-fabricated garage kits which BGI built as a part of TBG's contract with its customers were invoiced by BGI to TBG.

Sometime during the year 2001, BGI began to experience severe financial difficulty, which became worse in 2002. BGI's

primary creditor was Old National Bank which had a first lien on most of the primary assets of BGI, Curt Bullock Builders, Inc., and another corporation set up by Randy Bullock named American Builders Financial Corporation. It is clear from the evidence that, by the middle of 2002, one of BGI's four pre-fabrication mills was shut down all but one day a week and another was open only a couple of days a week as a result of serious cash flow problems, making it impossible for BGI to purchase materials from which to build the pre-fabricated garage kits. In fact, there is evidence that some BGI salesmen were actually ordering and paying for concrete using their personal credit cards in order to try to complete pending customer contracts.

Armed with the knowledge that BGI was experiencing financial difficulty, Terry Bullock conducted off-and-on negotiations with BGI to acquire its business. The negotiations between Terry Bullock and BGI began at least a year, and possibly as much as 2 years, prior to September 2002. The evidence indicates that these negotiations were carried on with the knowledge of BGI's largest creditor, Old National Bank, and that, in fact, the Bank was actively involved in these negotiations at various points. There is no dispute that Terry Bullock was interested in acquiring BGI, because his company TBG had no other source of supplier for the garages it sold. Unlike BGI, Terry Bullock's business operation in TBG was profitable, and Terry Bullock was very interested in the tax advantages of a 2.5 million dollar net operating loss carry forward which was on BGI's books. It is apparent that Terry Bullock wanted to keep the business of BGI going and to acquire the stock or assets of BGI and its related companies, but that he had no desire to shoulder BGI's debt load to Old National Bank and BGI's other creditors. While BGI was desirous of cutting a deal with Terry Bullock, it is clear that Old National Bank, in an attempt to protect its position as BGI's largest creditor, asserted conditions that Terry Bullock was either unable or unwilling to meet in his attempt to acquire BGI.

In September 2002, negotiations between Terry Bullock and BGI for the acquisition of BGI broke down, and it became apparent that BGI's business was within days of shutting down. Realizing that the cessation of BGI's business would severely hamper his efforts to acquire either the stock or assets of BGI and also damage his business, TBG, Terry Bullock and BGI devised a plan to keep BGI open with the hope that further negotiations would result in an acquisition of BGI by Terry Bullock.

To effectuate a plan to continue BGI's operations, Terry Bullock formed a new company known as T.L. Bullock Builders, Inc. (TLBB). In turn, TLBB and BGI entered into a written agreement, dated September 6, 2002, under which BGI and its related companies leased their business assets to TLBB for the purpose of completing some 300 outstanding garage contracts. BGI and its related companies were the lessors under this agreement, and TLBB was the lessee. The provisions of the agreement were essentially as follows:

1. The agreement had a lease term from September 7, 2002, until March 31, 2003.

2. TLBB was to take control of all real estate, equipment, inventory, and other personal property of the BGI companies in exchange for payment of $1 per month.

3. The Lessor, BGI, and its entities was to pay all utilities on the assets leased.

4. The Lessor was to pay for all insurance at its expense on leased property and add the Lessee as an additional named insured.

5. After March 31, 2003, the Lessee could continue to lease the assets at fair market value.

6. All existing contracts, as of September 7, 2002, to build garages were considered receivables of BGI and were not assigned to TLBB, the Lessee, under the contract.

7. Prior to April 1, 2003, TLBB, as Lessee, could also buy all the shares of BGI and Curt Bullock Builders, Inc. for the sum of $1 and could also purchase Randy Bullock shares in his related company, American Builders Financial Corporation, for the sum of $140,000, to be distributed to the shareholders.

8. TLBB agreed to complete all existing garage contracts for cost plus a 10% profit.

9. All new garage contracts entered after September 6, 2002, were to be the property of TLBB.

10. TLBB was not assuming any debt of BGI or its related entities that existed prior to September 6, 2002, and, further, any monies advanced to pay any such debt was to be reimbursed immediately to TLBB.

In addition to the "lease agreement" entered into between BGI and TLBB, the parties executed a separate agreement wherein an escrow account was established at a bank chosen by Terry Bullock into which all funds generated under the lease agreement were to be placed, with Terry Bullock as an agent for BGI. The evidence indicated that some $276,000, which was held in a customer deposit account of BGI, was transferred into this escrow account at the start of the relationship between the parties. Although it is not entirely clear, it is apparent that this $276,000 plus in funds was generated by customer deposits on the approximately 300 garage contracts which TLBB had agreed to complete under the agreement of the parties.

As was anticipated by the parties, TLBB was required to loan significant sums to BGI to pay creditors that existed prior to the September 6, 2002, agreement. Payment of these creditors was necessary to keep the BGI operations running. These creditors included materialmen, suppliers, employees, sub-contractors, and BGI's insurance carrier. In order to fund these payments, Terry Bullock personally loaned the sum of $500,000 to TLBB, which, in turn, was loaned to BGI for these creditor payments. The evidence is clear that TLBB was formed for the sole purpose of performing the agreement of September 6, 2002, and that its only asset was the $500,000 in a separate bank account resulting from Terry Bullock's personal loan.

The relationship contemplated by the September 6, 2002, agreement lasted only for a period of three weeks between September 7, 2002, and September 28, 2002, at which time TLBB ceased performing under the September 6, 2002, agreement. The evidence at trial established that substantial sums of money were collected on the garage contracts which were the subject of the September 6, 2002, agreement, those funds were placed in the escrow account controlled by Terry Bullock, as agent for BGI, and the majority of those funds were paid over to TLBB during the three week period between September 7, 2002, and September 28, 2002. It is the payment of those funds that is the subject of this adversary proceeding.

*Conclusions of Law*

■ Before addressing the substantive matters raised in this case, it is necessary to resolve two housekeeping matters raised by the parties. First, the Plaintiff has requested that the Court take judicial notice of the underlying bankruptcy proceeding of Debtor, BGI, for the purpose of showing that the Defendants received more in transfers from BGI during their relationship than they would have received in a Chapter 7 proceeding, which is a crucial element under 11 U.S.C. § 547(b)(5). The Defendants object to this request, indicating that the Plaintiff should have raised this issue during the course of trial, as it is a critical element for the Plaintiff's burden of proof. In this regard, the Court finds that the authority cited by the Plaintiff supports the request for the Court to take judicial notice. The Plaintiff's request for judicial notice is appropriate in that it does not raise any facts not known to the Defendants during the course of trial.

In conjunction with their written closing arguments, the Defendants filed a Motion to Amend First Amended Answer and Affirmative Defenses to conform to the evidence, requesting that a fifth affirmative defense under 11 U.S.C. § 547(c)(6) be added to their Answer. A review of the authority cited by the Defendants leads the Court to conclude that Defendants' Motion to Amend First Amended Answer and Affirmative Defenses should be allowed. Addition of the fifth affirmative defense under 11 U.S.C. § 547(c)(6) is not prejudicial to the Plaintiff under the facts of this case and is fully supported by Rule 7015(b) of the Federal Rules of Bankruptcy Procedure.

· Under Count I of the Plaintiff's Amended Adversary Complaint, Plaintiff seeks to avoid certain transfers between BGI and TLBB in September 2002, in the total sum of $430,681.42, as preferential transfers under 11 U.S.C. § 547(b), which states:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days and one year before the date of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

■ The Plaintiff/Trustee bears the burden to prove all five elements of § 547(b) by a preponderance of the evidence. *Chrysler Credit Corp. v. Hall*, 312 B.R. 797 (E.D.Va.2004).

■ A careful examination of the undisputed facts in this case leads to the clear

conclusion that the Plaintiff/Trustee has met his burden under each of the five elements of 11 U.S.C. § 547(b). The transfers at issue in this case were clearly preferential. However, the Court's inquiry does not stop at this point. Next, the Court must consider whether any of the exceptions under 11 U.S.C. § 547(c) apply. The Defendants have the burden to prove the non-avoidability of the subject preferential transfers under sub-section (c) of § 547. *See: Chrysler Credit Corp. v. Hall, supra,* at 802, citing *In re Gem Construction Corp. of Virginia,* 262 B.R. 638 (Bankr.E.D.Va.2000).

Title 11 U.S.C. § 547(c)(1) provides that:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

In considering the undisputed facts of this case in reference to § 547(c)(1), the Court finds that the Defendants have established that the transfers in question fall within the "new value" exception. Although the agreement between the parties in this case, entered on September 6, 2002, is an unusual one, the Court can see nothing in this agreement that is either illegal or improper in any way. The parties were hopeful that by entering into the subject agreement they could somehow save a longstanding business from ruin. The fact that the parties were unable to achieve the results that they desired is irrelevant. As the Court noted at the outset, it found that

the testimony of all of the witnesses was credible. This finding included Defendant, Terry Bullock, and his accountant, Vicki McGuar. The undisputed facts of this case show that Defendant, Terry Bullock, made a good faith effort to carry out his obligations under the subject agreement, but found that the Debtor Corporation's financial distress was beyond repair.

The evidence in this case establishes that Terry Bullock, through TLBB, advanced sums to pay creditors of BGI far in excess of the sums complained of by the Plaintiff in Count I of the Amended Adversary Complaint. Under the agreement of the parties, it is clear that TLBB was entitled to be reimbursed for those advances as funds became due, and that is exactly what happened in this case. The authority cited by Defendants fully supports the conclusion that the transfers in question under Count I of the Amended Adversary Complaint cannot be avoided. *In re EDC, Inc.,* 930 F.2d 1275 (7th Cir. 1991); *In re Bellanca Aircraft Corporation,* 850 F.2d 1275 (8th Cir.1988). The Court additionally notes that, but for the efforts of Defendants, Terry L. Bullock and TLBB, the operations of the Debtor Corporation would have ceased shortly after September 6, 2002, leaving substantially more creditors unpaid than existed when the Defendants ceased performance under the parties' agreement on or about September 27, 2002. All in all, the equities of this case lead to a conclusion that judgment should be entered in favor of the Defendants under Count I of the Amended Adversary Complaint.

In Count II of his Amended Adversary Complaint, the Trustee seeks a judgment against Terry L. Bullock, individually, under the theory that Terry L. Bullock breached fiduciary duties which he owed to

BGI. The Trustee seeks damages in the amount of $758,000, representing income from BGI's accounts receivable, which the Trustee alleges were diverted to Terry L. Bullock's company, TLBB, for the purpose of repaying loans from TLBB to BGI or for operating expenses of TLBB.

In order to show a breach of fiduciary duty by Terry L. Bullock to BGI, the Trustee must prove by a preponderance of the evidence that: (1) there was a fiduciary duty owing by Terry L. Bullock to BGI; (2) there was a breach of that fiduciary duty; and (3) that BGI was damaged as a result of that breach. *Petri v. Gatlin,* 997 F.Supp. 956 (N.D.Ill.1997); *LaSalle Bank Lake View v. Seguban,* 937 F.Supp. 1309 (N.D.Ill.1996). A fiduciary duty may arise as a result of the nature of the parties relationship such that a fiduciary duty is created as a matter of law. *Ransom v. A.B. Dick Co.,* 289 Ill.App.3d 663, 224 Ill.Dec. 753, 682 N.E.2d 314 (1st Dist.1997). Where a fiduciary duty does not arise as a matter of law, a fiduciary relationship must be proven by clear, convincing, unequivocal, and unmistakable evidence which would lead to only one conclusion. *State Security Ins. Co. v. Frank B. Hall & Co.,* 258 Ill.App.3d 588, at 595, 196 Ill.Dec. 775, 630 N.E.2d 940, at 945 (1st Dist.1994).

Under the undisputed facts of this case, the Court finds that the Trustee has failed to meet his burden of proof to establish a fiduciary relationship between Defendant, Terry L. Bullock, and BGI. The Court finds that the actions of Terry L. Bullock in this case were within the bounds of the September 6, 2002, agreement between the parties, and that funds paid from BGI to TLBB were paid as contemplated under that agreement.

Assuming arguendo that the Court was able to find a fiduciary relationship between Terry L. Bullock and BGI, the Court must conclude that the Trustee has failed to show a breach of any fiduciary duty. Even though the parties were ultimately unsuccessful in their attempt to salvage the operations of BGI, there is no evidence to indicate that Terry L. Bullock acted solely in his own best interest or in the best interest of TLBB. The evidence indicates that, during the brief relationship between the parties, expenses of BGI, including employee salaries, were paid from funds received from BGI contracts, and that, at the conclusion of the parties relationship, BGI remained operational and in no worse condition that prior to the September 6, 2002, agreement. The facts of this case lead the Court to the inescapable conclusion that, but for the efforts of Terry L. Bullock and TLBB, the operations of BGI would have ceased shortly after September 6, 2002, and none of the funds at issue in this case would have been generated. This fact also supports the Court's conclusion that the Trustee has failed in his burden to prove that BGI was somehow damaged by any breach of fiduciary duty by Terry L. Bullock.

Count III of the Amended Adversary Complaint seeks judgment, in the sum of $758,000, against TLBB under the theory that TLBB converted this sum of money for its own purpose contrary to BGI's property rights and those of BGI's secured creditor, Old National Bank. Although not set out in Count III, the Trustee, in his closing arguments, also asserts that Terry L. Bullock, individually, participated in this conversion, and that, as such, he should be held jointly liable with TLBB. Even though the Amended Adversary Complaint seeks judgment in the amount of $758,000, it is apparent from the Trustee's closing

argument that at present he is claiming only a conversion in the amount of $49,975.99.

In order to prove a cause of action for conversion, the Trustee/Plaintiff must prove by a preponderance of the evidence that: (1) BGI has a right to the property at issue; (2) BGI has an absolute and unconditional right to the immediate possession of the property at issue; (3) BGI made a demand for possession of the property; and (4) that TLBB and/or Terry L. Bullock wrongfully and without authorization assumed control, dominion, or ownership over the property. *Cirrincione v. Johnson,* 184 Ill.2d 109, 234 Ill.Dec. 455, 703 N.E.2d 67 (1998).

In support of his position, the Trustee argues that TLBB converted BGI accounts receivable totaling $49,975.99. These receivables were in the form of checks payable to BGI that were endorsed by TLBB and deposited in its operations account. The Trustee argues that BGI had a right to these funds and that it had an absolute and unconditional right to the immediate possession of the funds. The facts adduced at trial do not support the Trustee's contention. Under the agreement between BGI and TLBB, it is clear that BGI did not have an absolute and unconditional right to immediate possession of the checks at issue. Rather BGI's rights to possession were subject to TLBB's rights for reimbursement of sums advanced by TLBB to BGI for BGI debts that pre-existed the September 6, 2002, agreement, and subject to TLBB's rights to payments of its costs of operation and 10% profit under the agreement. The undisputed facts of this case show that, even after taking possession of the checks at issue, TLBB remained in a negative position as to the funds advanced to BGI, not even taking into account the fact that TLBB was entitled to a 10% profit. For these reasons, the Court must conclude that the Trustee/Plaintiff has failed to meet his burden of proof showing a conversion of the funds at issue.

**IT IS SO ORDERED.**